444 F.Supp. 1148 (1978)
INTERNATIONAL TELEPHONE AND TELEGRAPH CORPORATION, Plaintiff,
v.
AMERICAN TELEPHONE AND TELEGRAPH COMPANY, Western Electric Company, Inc. and Bell Telephone Laboratories, Inc., Defendants.
No. 77 Civ. 2854 (GLG).
United States District Court, S. D. New York.
January 23, 1978.
*1149 Blecher, Collins & Hoecker, Los Angeles, Cal., LeBoeuf, Lamb, Leiby & MacRae, Robert E. McKee, New York City, for plaintiff; Maxwell M. Blecher, Daphine M. Stegman, Los Angeles, Grant S. Lewis, Jay G. Safer, New York City, of counsel.
Dewey, Ballantine, Bushby, Palmer & Wood, New York City, Sidley & Austin, Chicago, Ill., for defendants; Leonard Joseph, New York City, Howard J. Trienens, Chicago, Ill., of counsel.

MEMORANDUM OPINION
GOETTEL, District Judge.
This is round one of a heavyweight antitrust contest between International Telephone and Telegraph Corp. ("ITT") and American Telephone and Telegraph Company ("AT&T"), alleged to be the largest corporation in the world. Three pretrial motions are pending. First, AT&T and the other defendants move to dismiss Count II of ITT's two-count complaint for failure to state a claim upon which relief can be granted. Second, ITT moves under Fed.R. Civ.P. 16 for an order "to conclusively adjudicate" certain facts based on the findings of an earlier Federal Communications Commission ("FCC") proceeding involving AT&T. Finally, ITT also moves to stay or dismiss the counterclaims alleged by AT&T in its answer. For the reasons stated below, defendants' motion to dismiss Count II is granted, and both of the plaintiff's motions are denied.

I. Summary of the Pleadings

ITT's complaint alleges violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and section 7 of the Clayton Act, 15 *1150 U.S.C. § 18. The complaint is a general attack on the economic structure of the Bell system, which, under AT&T's ownership, is the predominant supplier of telephone services to the American public. The system is composed of AT&T, which owns substantial stock in and is alleged to control various other corporate components: Western Electric ("Western"), the manufacturing and supply unit of the system; Bell Telephone Laboratories, Inc. ("Bell Labs"), the research and development arm; and the various local Bell operating companies which provide telephone service to consumers. All but one of the operating companies are named as non-defendant co-conspirators.
Count I of the complaint alleges that the defendants have engaged in an unlawful combination and conspiracy to restrain trade unreasonably, and that they have monopolized, and attempted to monopolize, the manufacture, distribution and sale of telecommunications equipment in violation of the Sherman Act. The gravamen of this charge is that defendants have caused the Bell operating companies to purchase equipment only from Western, rather than from independent manufacturers. Accordingly, the complaint alleges that defendants have conspired to ensure that Western would be the manufacturer of substantially all the telecommunications equipment needed by the operating companies, and that the operating companies would refrain from purchasing better and less expensive equipment from manufacturers other than Western. Specifically, ITT alleges that it has manufactured "channel banks," a general type of switching equipment, which were better or cheaper than those built by Western, but that the operating companies have nonetheless primarily purchased their channel banks from Western. The alleged conspiracy to restrain trade is said to have resulted in lost sales to ITT, and other damages, in excess of $50,000,000. ITT requests treble damages.
Count II of the complaint repeats all of the preceding Sherman Act allegations, and then asserts that the effect of AT&T's holding of all of Western's stock has been to lessen competition substantially and to tend to create a monopoly in the sale of telecommunications equipment in violation of section 7 of the Clayton Act. Paragraph 5 of the complaint alleges that AT&T acquired its Western holdings in 1882, which was thirty-two years before the enactment of the Clayton Act in 1914.
AT&T's answer asserts various denials and defenses. It also alleges two counterclaims against ITT on much the same grounds that the complaint is based. In the counterclaims, AT&T alleges that ITT has engaged in predatory pricing and has unfairly disparaged Western's products. In addition, defendants claim that ITT has engaged in the same kind of preferential purchasing practices of which they are accused. It is in this context that the three motions arise.

II. The Motion to Dismiss Count II

Defendants' motion under Fed.R. Civ.P. 12(b)(6) is addressed only to Count II of ITT's complaint, the Clayton Act claim. Defendants argue that the acquisition in 1882 of Western Electric by AT&T cannot be the basis of a claim under section 7 of the Act.[1] With the exception of a recent district court bench opinion,[2] no court has directly addressed the issue whether section 7 may be applied to pre-Clayton Act acquisitions.
Section 7 of the Clayton Act, as originally enacted in 1914, provided:
"No corporation engaged in interstate commerce shall acquire, directly or indirectly, the whole or any part of the stock *1151 or other share capital of another corporation engaged in interstate commerce, where the effect of such acquisition may be to substantially lessen competition between the corporation so acquired and the corporation making the acquisition or to restrain such commerce in any section or community, or tend to create a monopoly of any line of commerce."
Ch. 323, § 7, 38 Stat. 730. In 1950, section 7 was amended to include within its proscription the acquisition of the assets of another corporation. Act of Dec. 29, 1950, ch. 1184, 64 Stat. 1125 (codified at 15 U.S.C. § 18 (1970)). Paragraph 5 of section 7, both as originally enacted and after the 1950 amendments, provides:
"Nothing contained in this section shall be held to affect or impair any right heretofore legally acquired . . .."
Ch. 323, § 7, 38 Stat. 730; ch. 1184, 64 Stat. 1125. Defendants contend that this "non-retroactivity" clause precludes a section 7 challenge to AT&T's pre-1914 acquisition of Western Electric stock.
In opposing the motion to dismiss Count II, plaintiff relies primarily on United States v. E. I. duPont de Nemours & Co., 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957). In that case, the Government challenged in 1949 duPont's holding of 23 percent of the stock of General Motors Corp., as a violation of both the Sherman and Clayton Acts. The duPont acquisitions of General Motors stock occurred in 1917 and 1919, approximately thirty years before the Government brought suit. The defendant argued that the Government could not assert a section 7 claim so long after the acquisition took place, when the original acquisition was otherwise lawful.
The Supreme Court disagreed. It held that the holding and use of stock could, in effect, ripen into a Clayton Act violation years after the acquisition:
"The appellees argue that the Government could not maintain this action in 1949 because § 7 is applicable only to the acquisition of stock and not to the holding or subsequent use of the stock. This argument misconceives the objective toward which § 7 is directed. The Clayton Act was intended to supplement the Sherman Act. Its aim was primarily to arrest apprehended consequences of intercorporate relationships before those relationships could work their evil, which may be at or any time after the acquisition, depending upon the circumstances of the particular case. The Senate declared the objective of the Clayton Act to be as follows:
`. . . Broadly stated, the bill, in its treatment of unlawful restraints and monopolies, seeks to prohibit and make unlawful certain trade practices which, as a rule, singly and in themselves, are not covered by the Act of July 2, 1890 [the Sherman Act], or other existing antitrust acts, and thus, by making these practices illegal, to arrest the creation of trusts, conspiracies, and monopolies in their incipiency and before consummation. . . .' S.Rep. No.698, 63d Cong., 2d Sess. 1. . . .
`Incipiency' in this context denotes not the time the stock was acquired, but any time when the acquisition threatens to ripen into a prohibited effect. See Transamerica Corp. v. Board of Governors, 206 F.2d 163, 166 [(3d Cir. 1953)]. To accomplish the congressional aim, the Government may proceed at any time that an acquisition may be said with reasonable probability to contain a threat that it may lead to a restraint of commerce. Even when the purchase is solely for investment, the plain language of § 7 contemplates an action at any time the stock is used to bring about, or is attempting to bring about, the substantial lessening of competition."
353 U.S. at 596-98, 77 S.Ct. at 879 (emphasis in original). The Court later restated its now famous "time of suit" rule: "We repeat, that the test of a violation of § 7 is whether, at the time of suit, there is a reasonable probability that the acquisition is likely to result in the condemned restraints." Id. at 607, 77 S.Ct. at 884.
Relying on this quoted language, and subsequent cases following the duPont *1152 holding,[3] ITT argues that it is the "holding and use" of Western stock that is challenged in the complaint  not the acquisition of the stock per se. As a result, ITT urges that it is not requesting a retroactive application of section 7, but, rather, a simple interpretation that here, as in duPont, an otherwise lawful acquisition may ripen into a section 7 violation years later. Therefore, the argument continues, paragraph 5 of the statute has no bearing on ITT's Clayton Act claim.
This circumlocution, however, cannot mask the essential issue of the attack on the 1882 acquisition of Western Electric. Whether the claim is characterized as challenging only the "holding and use" of the Western stock, it obviously implicates the acquisition of that stock by AT&T. The issue that cannot be avoided is whether section 7 of the Clayton Act can be applied to corporate stock purchases occurring before the Act was passed in 1914. More specifically, the issue for decision here is the meaning of paragraph 5 of section 7.
Although the defendants, in their brief, suggest that the language of paragraph 5 is so plain that no further investigation is necessary, the Court will not accept the invitation to revive the "plain meaning" rule of statutory interpretation. It is generally safe to say that language is never so clear as to permit an unmistakable interpretation of its meaning from the bare words alone. Although the "plain meaning" doctrine has been authoritatively disavowed, see e. g., United States v. American Trucking Association, 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940), lower courts continue to jump to what are later found to be mistaken conclusions of the "plain" meaning of language. See, e. g., Galanis v. Pallanck, 568 F.2d 234 (2d Cir. 1977), rev'g 429 F.Supp. 1215 (D.Conn.1977); GAF Corp. v. Milstein, 453 F.2d 709, 716 (2d Cir. 1971), rev'g 324 F.Supp. 1062 (S.D.N.Y.1971). The Court agrees that the better approach involves the identification of a purpose behind the statute and the interpretation of meaning in the light of such purpose. See Cabell v. Markham, 148 F.2d 737, 739 (2d Cir.), aff'd, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945);[4] H. Hart & A. Sacks, The Legal Process 1267-68, 1413-17 (unbound manuscript 1958). It is in this investigation of the purpose to be attributed to a statute that external sources of guidance like legislative history and the state of prior law may be properly considered.
Section 7 prohibits acquisitions which tend to lessen competition. The state of the law generally on the retroactivity of statutes, of course, was the same in 1914 as it is today. Statutes normally have only a prospective effect unless Congress indicates otherwise in "clear, strong and imperative" language. United States v. Heth, 7 U.S. (3 Cranch) 399, 413, 2 L.Ed. 479 (1806); Monell v. Department of Social Services, 532 F.2d 259, 261-62 (2d Cir. 1976), cert. granted, 429 U.S. 1071, 97 S.Ct. 807, 50 L.Ed.2d 789 (1977) (No. 75-1914). Even without paragraph 5, then, the general presumption would be that the section 7 prohibition of anti-competitive acquisitions applied only to those occurring after enactment. On its face, paragraph 5 reaffirms this general proposition, and, from its language, it appears that its purpose was to ensure that pre-Act acquisitions would be immune from attack under section 7.[5]
*1153 Plaintiff contends that the purpose of paragraph 5 was not to so immunize pre-1914 acquisitions, but ITT has failed to demonstrate what other purpose could be attributed to the paragraph. In its brief, ITT offers the alternative that paragraph 5 was meant only to immunize acquisitions in which the acquired stock had been divested or sold before 1914. At oral argument, plaintiff's counsel argued that several other purposes might be attributed to paragraph 5, but details of these alternatives were not given. Given the general presumption in favor of non-retroactivity, and the apparent purpose of the language of paragraph 5 to reinforce this rule, the Court finds that this should be the interpreted purpose of paragraph 5 unless the legislative history of the statute indicates otherwise.
The legislative history of the Act supports the view that the purpose of paragraph 5 was to immunize pre-Act acquisitions from the reach of section 7 and does not in the least support any alternative conclusions. At the time the legislation was proposed and debated, it was directed at the evil of the "holding companies." As the Senate Report quoted by the Supreme Court supra, states, the bill, unlike the Sherman Act, was designed to prohibit the creation of anti-competitive corporate combinations "in their incipiency." The minority of the House Judiciary Committee opposed the inclusion of paragraph 5 precisely because it would prevent the application of section 7 to pre-1914 acquisitions:
"Sec. [7] deals with the evil of the holding company. It does so in a most unsatisfactory manner. Nothing in this section applies to holding companies already organized."
H.R.Rep.No.627, Part 3, 63d Cong., 2d Sess. 7 (1914).
Similarly, the debates in the Senate focused on the issue of retroactivity, and did not consider any alternative purposes attributable to paragraph 5. Senator Cummins attempted three times to insert language in section 7 and a related bill which would have given the retroactive effect urged by ITT here. He proposed that the bill make it unlawful not only to "acquire" the stock of another corporation, but also to "own, hold, or control" stock when that might have an anti-competitive effect. 51 Cong.Rec. 12987, 13112, 14473 (1914). Senator Cummins' proposal was defeated by the Senate on each occasion. Id. at 12993, 13113, 14476. Senator Chilton explained that the rejection of Cummins' proposal was based on the belief that to make the statute retroactive would have serious disruptive effects.[6] While it might be improper *1154 for the Court to view this legislative material as independently controlling, it is absolutely clear that in the framework of the Court's analysis, the legislative history does not offer any support for an alternative purpose of paragraph 5, and, in fact, strongly reinforces the conclusion that paragraph 5 is a specific affirmation of the normal nonretroactivity of statutes.
Nothing in the duPont opinion contradicts this conclusion. The duPont Court, of course, did not address the question whether section 7 could be applied to pre-1914 transactions. The acquisitions challenged there occurred well after that date, and the issue was whether the potentiality for lessening competition could be measured at a time subsequent to the acquisitions. The Court used its "holding and use" language in response to the argument that the legality of the acquisition must be measured at the time of the transaction, and not at some later date. This Court cannot read into the Supreme Court's opinion an intent to interpret "acquire" in section 7 to include "holding and use" in such a way as to read paragraph 5 out of the statute.
Moreover, both the majority and dissent in duPont assumed that the 1950 amendments to the Act did not apply in that case, because duPont's acquisitions had occurred prior to the amendments and the amendments contained the identical non-retroactivity clause. 353 U.S. at 586 n.4, 77 S.Ct. 872; id. at 612 n.3, 77 S.Ct. 872 (Burton, J., dissenting). In his dissent, Justice Burton criticized the expansive holding of the majority that any acquisition, "after the enactment of the Clayton Act," could be attacked under section 7 "retroactively." Id. at 611, 77 S.Ct. at 886. Clearly, if duPont implies any guidance on the issue to be decided in the instant case, it is that none of the justices seemed to consider it possible to apply section 7 to a pre-Act acquisition.[7]
Other cases cited by the plaintiff following duPont are similarly inapposite. Gottesman v. General Motors Corp., 414 F.2d 956, 965 (2d Cir. 1969), described the unlawfulness of duPont's activity in terms of its "status" as a stockholder in General Motors. See also United States v. Schine, 260 F.2d 552, 555 (2d Cir.), cert. denied, 358 U.S. 934, 79 S.Ct. 318, 3 L.Ed.2d 306 (1958). Both these cases were cited by the Supreme Court in United States v. ITT Continental Baking Co., 420 U.S. 223, 243 n.14, 95 S.Ct. 926, 936, 43 L.Ed.2d 148 (1975), as examples of "lower federal courts [that] have also recognized that the status approach to acquisitions is the proper one." Continental Baking, however, dealt with the interpretation of a consent order which ITT had been found to have violated, and the question whether ITT's retention of the prohibited acquisitions should result in continuing daily penalties under the civil penalties sections of the Clayton Act and the Federal Trade Commission Act, 15 U.S.C. §§ 21(l), 45(l). As such, this "status" language was addressed to a completely different issue from the one posed here. Accordingly, it would be incorrect to assume that the word "status" should be inserted into section 7 in place of "acquire" for all purposes.
To interpret "acquire" to mean "status" in this case would effectively render paragraph 5 meaningless. Assuming, as it *1155 must, that every congressional enactment is purposive, see H. Hart & A. Sacks, supra, at 1414-15, and that any interpretation that completely emasculates the words in a statute is improper, the Court finds that paragraph 5 precludes a section 7 challenge to AT&T's 1882 acquisition. This result is supported by both the language of paragraph 5 and the legislative history of the Clayton Act, as well as sound tenets of statutory interpretation. The defendants' motion to dismiss Count II of the complaint must be granted.

III. The Motion "to Conclusively Adjudicate" Certain Facts

ITT has moved under Fed.R.Civ.P. 16 for an order deeming certain factual findings, allegedly found by the FCC, to be conclusively adjudicated against AT&T. In essence, ITT claims that certain findings adverse to AT&T were made by the Commission in its recent investigation of the Bell System's practices and policies, and that, as a result, AT&T should be barred by the doctrine of collateral estoppel from relitigating those factual findings here.
The FCC proceeding upon which ITT's motion is based was the Commission's response to rate increases filed by AT&T in November of 1970 and January of 1971. See Docket 19129, 27 F.C.C.2d 151 (1971). The purpose of the proceeding generally was to determine whether the rate increases were "just and reasonable" under the Communications Act, see 47 U.S.C. §§ 201-05.
What began as a straightforward ratemaking review in the Commission expanded into a broad investigation into the economic structure of the Bell System and the telecommunications industry as a whole. The ratemaking proceeding was divided into two phases. Phase I inquired into the rate of return that should be permitted to AT&T on its base, and it culminated with a Final Decision on December 22, 1972. (38 F.C. C.2d 213). The decision allowed the new rates to stay in effect pending further investigation by the FCC in Phase II. Phase II was a far-reaching inquiry into the appropriate rate base to be used in the ratemaking calculation. It included the investigation of "all ramifications of the relationship of Western Electric to the Bell System and its effects upon telephone rates and revenue requirements" of AT&T. 38 F.C. C.2d at 244.
After an investigation lasting more than five years, the Initial Decision in Phase II was rendered by the Administrative Law Judge on August 2, 1976. (64 F.C.C.2d 131). The Initial Decision was reviewed by the Commission, and the Final Decision of the Commission was issued on March 1, 1977. (64 F.C.C.2d 1). ITT bases its claim of collateral estoppel on this lengthy Final Decision in Docket 19129.
An exhaustive restatement of all the Commission's conclusions and recommendations is not necessary here. Overall, in its consideration of the reasonableness of telephone charges for interstate and foreign communications service, the FCC concluded that the rate increases filed by AT&T were justified under the general public interest standard of the Communications Act. In the Final Decision, however, the Commission did draw a number of additional conclusions about the general state of the telecommunications industry and the particular roles played by the various corporate arms of AT&T. If it had been a judicial decision, this portion might have been described as "dicta." ITT nevertheless argues that the Commission's broad inquiry into the Bell System led it to make specific findings adverse to AT&T, some of which relate to the purchasing decisions of the operating companies and the manufacturing and sales policies of Western Electric.
Initially, ITT requests a general holding by the Court that the doctrine of collateral estoppel applies to the findings made by the FCC. In this way, ITT suggests, the parties can then negotiate a stipulation delineating which FCC findings are to be deemed conclusively adjudicated for the purposes of the antitrust case. Alternatively, ITT lists thirty-five alleged findings by the Commission and asks that they be held indisputable in the instant action.
*1156 The role of collateral estoppel in precluding multiple litigation of identical issues has grown substantially in the last decade and, as the rules under which it is applied have loosened, the questions as to its applicability to specific cases have grown more complex. The landmark case in the area remains Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), in which the Supreme Court unanimously dispensed with the "mutuality" requirement of the doctrine,[8] and held that a determination of patent invalidity against a party was binding in a subsequent suit by the same party to enforce the patent against others. Five years earlier, the Court had held in United States v. Utah Construction & Mining Co., 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966), that collateral estoppel, or res judicata, effect could be given to findings made by an administrative agency, at least when the agency made the findings while acting in a judicial capacity and the parties were given a full and fair opportunity to litigate the issues in the administrative proceeding. Id. at 422, 86 S.Ct. 1545.[9]
The general rule in the case of non-adjudicatory agency action, however, is that collateral estoppel does not apply. Arizona Grocery Co. v. Atchison, Topeka & Santa Fe Ry., 284 U.S. 370, 389, 52 S.Ct. 8, 76 L.Ed. 515 (1932). The rule is most often cast in terms of the dichotomy between "adjudicatory" agency action which, like the normal judicial proceeding, involves resolution of disputed issues of past conduct, and "legislative" agency action, which involves primarily the fashioning of prospective rules to govern future conduct. In the words of Professor Davis:
"Only what is adjudicated can be res judicata. Administrative action other than adjudication cannot be res judicata. Even if an exercise of the rule-making power depends on a finding of facts, neither the rule nor the finding is regarded as res judicata."
K. Davis, 2 Administrative Law Treatise § 18.08, at 597 (1958).
The reasons for this limitation on the doctrines of res judicata and collateral estoppel can be divided into two categories. The first is that in most instances the technical requirements of the doctrines are not satisfied by the normal rulemaking or legislative proceeding. The opportunity to present and cross-examine witnesses, a clear allocation of the burden of proof, and a clear standard against which past conduct is being measured, all of which enhance the adjudication process in resolving issues of fact, are normally either not present or materially different in non-adjudicatory agency proceedings. The absence of any of these adjudicatory safeguards leads to the inapplicability of collateral estoppel.[10]
*1157 Accordingly, the parties here dispute the nature of the FCC Phase II proceeding. ITT's claim of estoppel is based in part on the adversarial character of the Phase II hearings. Although the Commission's inquiry clearly fell into the ratemaking classification of the Administrative Procedure Act,[11] and therefore did not come within the prescription of the Communications Act requiring the separation of trial and hearing staff,[12] the Commission nonetheless decided to introduce some procedural safeguards into the hearings. This FCC action came in response to growing criticism of the practice of allowing the agency's staff to play the dual role of advocates at the hearing and participants in the decision-making process.[13] As a result, the Phase II proceeding took on a more formalized adjudicatory air, with testimony presented by witnesses subject to cross-examination and the trial staff prohibited from ex parte communication with the decision-makers.
It is clear, however, that the mere investigation of some past conduct, or the introduction of some procedural safeguards, does not transform the agency proceeding into "adjudication" for all purposes. See American Telephone & Telegraph Co. v. FCC, 449 F.2d 439, 455 (2d Cir. 1971); Wilson & Co. v. United States, 335 F.2d 788, 796-97 (7th Cir. 1964), cert. denied, 380 U.S. 951, 85 S.Ct. 1082, 13 L.Ed.2d 968 (1965). Moreover, other procedural safeguards necessary for the application of estoppel were not clearly present in the FCC proceeding. As the proponent of the rate increases, AT&T had the burden of persuading the Commission that the increases were justified. See 47 U.S.C. § 204. In carrying that general burden, AT&T apparently failed to convince the FCC that all objections to its practices were unfounded. It is unclear, however, where the burden of proof was placed in relation to the issues allegedly determined adversely to AT&T. Similarly, it is unclear whether AT&T could have obtained effective judicial review of the FCC decision by appeal, and such appellate opportunity generally is a prerequisite to the application of collateral estoppel.[14] On this technical level, therefore, ITT's argument for application of the doctrine is unconvincing.
The more essential reason for distinguishing legislative from adjudicatory administrative action, however, goes to the inherent character of the findings made by an official body in a ratemaking proceeding that is addressed primarily to the future. The Phase II hearings were directed at prescribing regulations or guidelines for future *1158 conduct, and as such, the FCC properly considered a wide range of evidence which enabled it to reach various conclusions about the state of the telecommunications industry and how services to the public could be improved. As with any legislative body, specific findings that past acts did or did not occur were essentially unnecessary to a reasoned conclusion about what was necessary or desirable for the future. Probabilities, likelihoods and general cost-benefit predictions all were considered in formulating future policy. As the Second Circuit stated in American Telephone & Telegraph Co. v. FCC, 449 F.2d 439, 454-55 (2d Cir. 1971), a comparable ratemaking case:
"[R]ate practice prescribed by the Commission . . . is for the future, and no issue of past damages for past acts was involved. To adopt Professor Davis' framework, the key questions of fact here were `legislative' rather than `adjudicatory'  that is, they were matters of statistics, economics, and expert interpretation, rather than questions of whether AT&T had violated some norm and would thus be subject to retrospective sanctions . . .."[15]
The most important difference, then, between "legislative" and "adjudicatory" facts is in the nature of the facts themselves. A legislative body is not confined to clearly defined issues of past conduct, but, rather, may properly consider a multitude of factors in determining what prospective rule will be most beneficial. As a result, rulemaking bodies do not generally make the kind of discrete factual findings of past conduct that the adjudicative process is specifically designed to provide. Cf. H. Hart & A. Sacks, The Legal Process 384-85 (unbound manuscript 1958).
The FCC findings offered by ITT in this case demonstrate quite well the distinct nature of such legislative facts. As the sampling set out in the margin shows,[16] the proffered findings are simply not sufficiently definite to be deemed conclusively adjudicated for judicial purposes. Generally, the Commission stated that it was "convinced" that certain AT&T practices were problems, or that some policies of the company either have had or were likely to have anti-competitive effects in the telecommunications equipment market. At other points in the decision, the Commission stated that it "agreed" with one position or that the record "appeared" to support certain other positions. These kinds of conclusions and speculations regarding propensities and potential regulatory problems, eminently *1159 proper for a legislative body to act on, are not the kind of conclusive factual findings upon which judicial resolution of legal issues depends. As such, the FCC findings are peculiarly inappropriate for acceptance as conclusively adjudicated facts in this action.
The Court does not hold that no finding of any ratemaking proceeding should ever be accorded collateral estoppel treatment by the judiciary. Indeed, as Professor Davis points out, the analysis should not consist of the mere labeling of an administrative proceeding as "legislative" or "adjudicatory," with the automatic conclusion that the former should not be given collateral estoppel or res judicata effect. K. Davis, 2 Administrative Law Treatise § 18.08, at 598 (1958). A more searching inquiry into the nature of the proffered findings and the manner in which they were made is necessary. Having made such an inquiry, it is clear that the FCC findings in the instant case fall short of the requirements for "conclusively adjudicated facts" in a judicial proceeding.
Moreover, even if the FCC had acted in a clearly judicial capacity and made findings on ultimate issues of fact posed in this antitrust case, it is clear that such findings could not be accepted by the Court as conclusive determinations of those issues. As the Supreme Court held in United States v. Radio Corporation of America, 358 U.S. 334, 346, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959), the FCC does not have jurisdiction under the Communications Act to "decide antitrust issues as such," and any decision rendered by the Commission under the public interest standard of the Act cannot have an estoppel effect on the antitrust issues presented here. To the extent that ITT proffers the FCC's findings as conclusive adjudications of ultimate issues in this action, they are clearly unacceptable under Radio Corporation of America.[17]
Accordingly, the Commission itself realized that its Phase II decision could not decide antitrust issues, per se, and it specifically explained the context in which allegations of "predatory intent" and other antitrust violations were considered within the framework of the public interest standard.[18] *1160 The FCC's acknowledgment of the unique role that antitrust considerations play in its decisions under the public interest standard confirms the logic of Radio Corporation of America, supra, in holding that public interest determinations by the FCC can have no preclusive effect in subsequent judicial actions under the antitrust laws.
The defendants also cite section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), in opposing such effect for the FCC findings. That section provides that judgments obtained by the Government in antitrust actions are admissible in subsequent private actions as "prima facie evidence" against the defendant in the Government action. Although the statute was enacted in the days when mutuality of parties reigned as the rule of collateral estoppel, and hence was designed to be an expansion of the doctrine for the benefit of private antitrust plaintiffs,[19] today section 5(a) apparently precludes the granting of estoppel effect even to prior adjudications of fact made by a court in a Government action. See, e.g., United States v. Grinnell Corp., 307 F.Supp. 1097 (S.D.N.Y.1969). This rule has been reaffirmed in the context of a prior adjudicatory action in the Federal Trade Commission. Purex Corp. v. Proctor & Gamble Co., 308 F.Supp. 584 (C.D.Cal.1970), aff'd, 453 F.2d 288 (9th Cir. 1971), cert. denied, 405 U.S. 1065, 92 S.Ct. 1499, 31 L.Ed.2d 795 (1972). Accordingly, AT&T asserts that it would be paradoxical to hold that the FCC Phase II proceeding could have a completely conclusive effect in this action, while at the same time a currently pending Government antitrust action against AT&T,[20] if it proceeded to judgment, would have only a prima facie effect here.
Although this argument for overall consistency in the law has some merit, the Court prefers to place its holding on the ground which distinguishes the FCC Phase II proceeding as a legislative administrative action, the findings of which are not entitled to collateral estoppel effect. Not only is this ground directed specifically to the deficiencies in ITT's collateral estoppel theory, but it also does not depend on support from what may be a completely obsolete statutory policy embodied in section 5(a).[21]
In summary, then, to the extent that the FCC Phase II findings are offered as factual findings entitled to collateral estoppel effect, the Court finds that the legislative nature of the FCC proceeding and the nonadjudicatory character of the proposed findings themselves prevent their reception here as conclusively adjudicated facts for the purposes of this action. To the extent the FCC findings are offered as preclusive findings on the ultimate antitrust issues in this case, they are even more clearly not entitled to collateral estoppel effect, under Radio Corporation of America, supra.[22] For these reasons, the plaintiff's motion for an order deeming the FCC findings conclusively adjudicated must be denied.

IV. The Motion to Dismiss or to Stay Counterclaims

In their answer, the defendants assert two defenses, which are not before the *1161 Court at this time, and which are alleged to be grounds to dismiss ITT's complaint. Briefly stated, the defenses are that 1) the FCC has exclusive jurisdiction of the subject matter raised in the complaint; and 2) that the Bell System, as a "unitary" enterprise, cannot be liable under the antitrust theories upon which the complaint is based. The defendants also assert counterclaims against ITT on grounds similar to those alleged in ITT's complaint. Because the defenses are facially inconsistent with the counterclaims, the defendants plead in the alternative, i. e., claiming that if the Court does have jurisdiction and the "unitary" defense theory is invalid, then ITT is liable on the similar grounds set forth in the counterclaims.
ITT has moved to dismiss or to stay the counterclaims, arguing that they are somehow "unripe" under Art. III of the Constitution. This somewhat novel claim is accompanied by an alternative request to stay the counterclaims as premature and unfair, because AT&T will pursue the claims only if other issues are decided against them." (Plaintiff's Brief, at 10).
The Court views the counterclaims as a manifestation of simple alternative pleading specifically permitted under Fed.Rs. Civ.P. 8(e)(2) and 13. Contrary to the string of "ripeness" cases cited by ITT, there is nothing hypothetical or factually undeveloped about AT&T's counterclaims. The "case or controversy" requirement of Art. III is fully met by such a concrete and definite allegation of facts, even though a controlling question of law may be uncertain. See, e. g., Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492 (2d Cir.), cert. denied, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961).
Similarly, the request to stay the counterclaims amounts to the same ripeness argument recast in procedural terms. ITT cites another group of cases holding that premature claims, like those for indemnity, contribution and malicious prosecution, cannot be asserted until the termination of the original litigation upon which they are based. See, e. g., Stahl v. Ohio River Co., 424 F.2d 52 (3d Cir. 1970). These cases are inapposite; they do not hold that counterclaims asserted under a theory inconsistent with theories of defenses are premature, or that such counterclaims should be stayed.
Finally, ITT asks the Court in its discretion to stay the counterclaims. The plaintiff, however, has not alleged any facts showing how it would be unfairly prejudiced by the litigation of AT&T's counterclaims along with the main claims against AT&T. At this point, both parties have asserted similar affirmative claims,[23] and it is a matter of litigation strategy when and if any defenses will be raised for resolution by the Court. The bell has not yet rung on round two of the contest. For these reasons, the plaintiff's motion to dismiss or to stay the defendants' counterclaims is denied.
SO ORDERED.
NOTES
[1] Defendants also assert that ITT's section 7 claim is barred by the four-year statute of limitations in 15 U.S.C. § 15b. Because of the Court's holding that the claim is precluded by paragraph 5 of section 7, it is not necessary to reach this issue.
[2] In an oral decision in Morse Prod. Mfg. v. American Tel. & Tel. Co., No. 77-2490-F (C.D. Cal., filed Dec. 12, 1977), the court dismissed an identical section 7 claim against AT&T's 1882 acquisition of Western Electric. In the same bench opinion, Judge Ferguson certified the question to the Ninth Circuit.
[3] See, e. g., United States v. General Dynamics Corp., 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974); FTC v. Consolidated Foods Corp., 380 U.S. 592, 85 S.Ct. 1220, 14 L.Ed.2d 95 (1965); United States v. Penn-Olin Chem. Co., 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964).
[4] As Judge Learned Hand stated in Cabell, "one of the surest indexes of a mature and developed jurisprudence [is] to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." 148 F.2d at 739. But cf. United Air Lines, Inc. v. McMann, ___ U.S. ___, 98 S.Ct. 444, 54 L.Ed.2d 402 (1977).
[5] This is not to say, of course, that a continuing combination or conspiracy is totally immune from the antitrust laws, for these are prohibited by the Sherman Act regardless of whether the acquisition that generated them occurred before the passage of the Clayton Act. It should be noted that because the Sherman Act prohibits not the act of acquiring, but rather combinations and conspiracies, it has been held to apply to conspiracies that were begun before, but continued after, its date of enactment. United States v. Trans-Missouri Freight Ass'n, 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007 (1897). One value of the Clayton Act allegation to the plaintiff in this case is that if it were sustained, then only the potentiality for anticompetitive effect would be required to be proved, while the Sherman Act requires a showing of actual restraint of trade.
[6] Senator Chilton explained that the reasons for rejecting retroactivity were practical, equitable and related to the legislators' view of constitutional power:

"In the first place, we had to consider the possible disturbance of business involved in making a retroactive rule at least of doubtful propriety. It is very doubtful whether or not we have the constitutional power to go into the States and say, notwithstanding the fact that you have a law here which permits a corporation engaged in business to own the stock of another corporation, we say by a law of Congress that that shall not be permitted, and, notwithstanding the fact that you have built up a business here, notwithstanding the fact that you have acquired a large amount of property, we are going to say from now on not only that you shall not own the stock of another corporation but that you must unscramble this condition which has grown up under the laws of the State and under the permission of the Federal Government.
The general rule is that all laws shall have a prospective effect. It is very unusual for Congress to enact a law reaching a condition which has grown up in the past under authority of law. . . . We did not think that the reasons urged before the committee were sufficient to make an exception at this time. We thought it doubtful whether or not we had the power to go as far as does the amendment. In the second place, we thought it very doubtful whether or not it would be best for the country, for all of the people, if it should be done, even if we did have the power. In the third place, we thought it very doubtful whether or not there should be brought about that kind of a conflict between the laws of the States and the regulation of commerce now to be made by the Congress of the United States."
51 Cong.Rec. 12989 (1914).
[7] In the end, ITT is forced to rely on the statement of a commentator that the Clayton Act "might" be applied to pre-1914 acquisitions. 2 J. von Kalinowski, Antitrust Laws and Trade Regulation ¶ 11.07[5] (1977) (citing duPont). The author's speculation on what a court might do, however, does not provide much support for such a holding. Moreover, the Court finds that of the commentaries that have addressed the retroactivity issue, the most persuasive support the view that a pre-Act acquisition is immune from attack under section 7. See generally Note, Market Power and the Antitrust Laws: "New" Old Section 7 of the Clayton Act, 66 Yale L.J. 1251, 1261 (1957); FTC, Report on Corporate Mergers and Acquisitions 153 (1953). Cf. Orrick, The Clayton Act: Then and Now, 24 Antitrust L.J. 44, 50-52 (1964); Bicks, Mergers and Acquisitions: A Government Lawyer's Views, 11 Antitrust L.J. 20, 27-28 (1957).
[8] See Bigelow v. Old Dominion Copper Mining & Smelting Co., 225 U.S. 111, 32 S.Ct. 641, 56 L.Ed. 1009 (1912).
[9] ITT cites a number of cases following the rationale of Utah Construction, in which clearly adjudicatory administrative actions were given collateral estoppel effect. None of the cases holds that rulemaking by an agency can give rise to findings to which collateral estoppel will apply. See, e. g., International Wire v. International Bd. of Elec. Workers, Local 38, 475 F.2d 1078 (6th Cir.), cert. denied, 414 U.S. 867, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973); Paramount Transport Sys. v. Teamsters, Local 150, 436 F.2d 1064 (9th Cir. 1971); Safir v. Gibson, 432 F.2d 137 (2d Cir.), cert. denied, 400 U.S. 850, 91 S.Ct. 57, 27 L.Ed.2d 88 (1970); Painters Dist. Council No. 38 v. Edgewood Contracting Co., 416 F.2d 1081 (5th Cir. 1969).

The only case cited to this Court by ITT that appears to give collateral estoppel effect to findings made in the course of an administrative ratemaking proceeding is Aloha Airlines, Inc. v. Hawaiian Airlines, Inc., No. 72-3594 (D.Haw. April 2, 1973) (unpublished opinion). In that case, the facts given binding effect by the court were essential to the outcome of the prior Civil Aeronautics Board proceeding, and the party seeking to assert collateral estoppel had successfully carried the burden of proof in the CAB. These factual circumstances are not present in the instant case. To the extent that Aloha Airlines may contradict this Court's analysis, the Court declines to follow the holding of that case.
[10] See, e. g., One Lot Emerald Cut Stones v. United States, 409 U.S. 232, 93 S.Ct. 489, 34 L.Ed.2d 438 (1972) (difference in burdens of proof precludes application of collateral estoppel); Young & Co. v. Shea, 397 F.2d 185, 188 (5th Cir. 1968), cert. denied, 395 U.S. 920, 89 S.Ct. 1771, 23 L.Ed.2d 237 (1969) ("substantial variance in the standard of proof" prevents application of the doctrine). See also United States v. Casale Car Leasing, Inc., 385 F.2d 707 (2d Cir. 1967); United States v. Alcatex, Inc., 328 F.Supp. 129 (S.D.N.Y.1971); Restatement (Second) of Judgments § 68.1(d) (Tent. Draft No. 3, 1976).
[11] Administrative Procedure Act § 1(6)-(7), 5 U.S.C. § 551(6)-(7).
[12] 47 U.S.C. § 409(c)(1).
[13] See Ross, Current ABA Proposals for Amendment of the Administrative Procedure Act, 23 Ad.L.Rev. 67 (1970); Administrative Conference of the United States, Committee on Rule Making, Improvements in the Conduct of Federal Rate Proceedings, Recommendation No. 19, reprinted as S.Doc. No. 24, 88th Cong., 1st Sess. 69-114 (1963). For the Second Circuit's view on the better practice, see American Tel. & Tel. Co. v. FCC, 449 F.2d 439, 453-54 (2d Cir. 1971).
[14] AT&T asserts that because the ultimate outcome of the Phase II proceeding validated the rate increases, AT&T received a judgment in its favor which it might not have been able to appeal. Under the Restatement (Second) of Judgments § 68.1(a) (Tent. Draft No. 3, 1976), estoppel can have no effect against such a party obtaining a judgment in its favor. See id., comment to § 68.1(a).

On another of what may be called AT&T's technical grounds in opposing ITT's motion, AT&T argues that even if estoppel can apply to the FCC proceeding, the findings submitted by ITT are "mediate" facts to which estoppel cannot attach. See The Evergreens v. Nunan, 141 F.2d 927, 929 (2d Cir.), cert. denied, 323 U.S. 720, 65 S.Ct. 49, 89 L.Ed. 579 (1944). In view of the Court's more general holding, there is no need to attempt to define what were "mediate" FCC findings and what were ultimate findings essential to the Commission's conclusions. Indeed, the complexity of this task also shows that attempting to apply collateral estoppel here would not be in the interest of efficiency.
[15] At another point in the Second Circuit's opinion, the court used as an example of a "purely prospective rulemaking proceeding" the very FCC proceeding at issue in the instant case. 449 F.2d at 454.
[16] At one point in its decision, the Commission stated:

"Of greatest concern to the Commission is the BOC's [the operating companies] lack of autonomy and independence from Western in equipment procurement. We find on this record that Western's present role in Bell System procurement has impeded, or is likely to impede, the full achievement of benefits to ratepayers because it precludes a fair opportunity for the general trade to also serve the BOC's equipment needs.
64 F.C.C. 2d at 15. (¶ 32).
The Commission further stated that the Bell System's procurement policies "appear to have been primarily inward-directed, i. e., to Western, and have apparently resulted in some actual or potential foreclosure of competitive sources of equipment supply."
64 F.C.C.2d at 41 (¶ 97).
Finally, the FCC stated:
"We found that the BOCs should be given greater autonomy and independence than they now have to procure equipment, and that the Bell System procurement and make/buy decision processes should be made more independent of Bell's internal manufacturing affiliate. The present Bell System policies and practices on BOC's equipment procurement were found to give insufficient control and influence to the BOCs in procurement matters, and too much control and influence to Western. We found this impeded, or was likely to impede, the general trade from having a fair and equal opportunity vis-a-vis Western to serve BOCs' equipment needs.
64 F.C.C.2d at 105 (¶ 291). This is an alternative conclusion about past conduct, at best, and just what "insufficient" means is difficult to say, as it relates to standards of competition under the antitrust laws.
[17] FTC v. Texaco, Inc., 180 U.S.App.D.C. 390, 555 F.2d 862 (1977) (en banc), cert. denied, 431 U.S. 974, 97 S.Ct. 2940, 53 L.Ed.2d 1072 (1977), a case cited by both parties, deals with a variation of this question  namely, in what circumstances can an administrative agency be found to have conclusively decided an issue so as to preclude another agency of overlapping jurisdiction from launching its own inquiry into the same issue. Although the majority in Texaco specifically did not reach the collateral estoppel issue, Chief Judge Bazelon, writing for the en banc court, stated that

"a court should approach gingerly a claim that one agency has conclusively determined an issue later analyzed from another perspective by an agency with different substantive jurisdiction."
555 F.2d at 881. The concurring and dissenting judges disagreed on whether in that situation collateral estoppel could apply to non-adjudicatory administrative findings. Id. at 893-94 (Leventhal, J., concurring); id. at 894, 923-26 (Wilkey & MacKinnon, JJ., dissenting).
Of course, in the context of FCC findings submitted as ultimate findings to a court in an antitrust case, Radio Corporation of America, supra, is authoritative support for a holding of no preclusive effect.
[18] The Commission stated:

"We further note that several allegations were made on this record that Bell has acted in a predatory or anticompetitive manner in particular instances or circumstances. We have considered these allegations and the matter of competition where appropriate in accordance with the public interest standard of the Communications Act. In this regard, at paras. 200-16 of SBS Applications, FCC 77-64, released February 8, 1977, there is a thorough discussion of the manner in which we consider antitrust and competitive issues as part of the statutorily-mandated public interest standard. Basically, while we must warrant that competition serves the public interest we cannot assume as do the antitrust laws that competition per se comports with the public interest. Some of our more particular findings regarding the allegations of predatory conduct appear infra, n.63, where we find there is not substantial record support one way or the other for any findings or conclusions that Bell has engaged in predatory conduct. Once again, our primary concern in this proceeding is with the impact that Bell actions have had, or are likely to have, on telephone ratepayers and not with whether such actions themselves are predatory in the antitrust sense."
64 F.C.C.2d at 11 (¶ 23) (footnote omitted). In footnote 63, the Commission concluded that "there is not substantial record support one way or the other . . . for any findings or conclusions that AT&T, Bell Labs or Western engaged in `predatory' conduct in the antitrust sense . . .." 64 F.C.C.2d at 41 n.63.
[19] See generally Comment, Use of Government Judgments in Private Antitrust Litigation: Clayton Act Section 5(a), Collateral Estoppel and Jury Trial, 43 U.Chi.L.Rev. 338 (1976).
[20] United States v. American Tel. & Tel. Co., Civ. No. 74-1698 (D.D.C., filed Nov. 20, 1974).
[21] See Comment, supra note 19, at 340-48.
[22] The Court's holding, however, does not appear to render the FCC's conclusions and recommendations completely meaningless in the context of this case. It appears that under Fed.R.Evid. 803(8), the factual findings of the Commission's report might be admissible into evidence. If such a decision were reached, the plaintiff might gain a substantial benefit from the Phase II decision, although admission of the FCC's findings into evidence would not prevent the introduction of opposing testimony or other evidence by the defendants. This admissibility issue, however, is not before the Court at this time, and the Court expresses no view on whether the FCC report would be admissible under Rule 803(8) or under any other evidentiary theory.
[23] The Court does not, of course, express any opinion on the validity of the "tit for tat" counterclaim  a stratagem that is becoming common in litigations between large corporations.