BORMAN, LELAND W.                                    TAX CODE  A01
6 SCOTT COURT                                        BILL NO.   6431
SPRINGFIELD, ILLINOIS

WHEREAS YOU HAVE FAILED TO PAY THE PERSONAL PROPERTY TAXES IMPOSED ON YOU WHEN DEMANDED PURSUANT TO THE REVENUE ACT OF 1939 AS AMENDED, IT IS NOW MY DUTY, AS SANGAMON COUNTY COLLECTOR, TO LEVY THE SAME, TOGETHER WITH THE COSTS AND CHARGES THAT HAVE ACCRUED THEREON, BY SEIZURE AND SALE OF YOUR PERSONAL PROPERTY.

, DEPUTY COLLECTOR IN AND FOR THE COUNTY OF SANGAMON, STATE OF ILLINOIS, IS HEREBY COMMANDED TO SEIZE YOUR PERSONAL PROPERTY.  SUCH PERSONAL PROPERTY WILL BE SOLD AT THE COUNTY BUILDING, SPRINGFIELD ILLINOIS, BY PUBLIC AUCTION NOT LESS THAN FIVE (5) DAYS FROM THE DATE OF THIS WARRANT.

SUCH PERSONAL PROPERTY MAY BE REDEEMED PRIOR TO THIS SALE BY PAYMENT IN FULL OF YOUR PERSONAL PROPERTY TAXES.

$526.48

IN WITNESS WHEREOF I HEREUNTO SET MY HAND AND THE SEAL OF THE OFFICE OF COUNTY TREASURER AND EX-OFFICIO COUNTY COLLECTOR IN AND FOR THE COUNTY OF SANGAMON, STATE OF ILLINOIS THIS 17TH DAY OF MARCH, A.D. 1977.

FRED H. TOMLIN, SANGAMON COUNTY TREASURER

Michele SINDONA, Petitioner,

v.

George V. GRANT, United States Marshal for the Southern District of New York, Acting Under a Warrant Issued at the Request of the Republic of Italy, Respondent.

No. 78 Civ. 2472 (HFW).

United States District Court, S. D. New York.

Nov. 15, 1978.

200

Mudge Rose Guthrie & Alexander, Schulte & McGoldrick, Clark Wulf & Le-

vine, New York City, for petitioner, by John J. Kirby, Jr., Lawrence V. Senn, Jr., Todd L. Klipp, Laurence A. Urgenson, Roberta R. Brackman, Robert Kasanof, Dynda L. Andrews, Ramsey Clark, Melvin L. Wulf, New York City, of counsel.

Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., New York City, for respondent, by John J. Kenney, Executive Asst. U. S. Atty., New York City, of counsel.

## OPINION

WERKER, District Judge.

The petitioner in this habeas corpus proceeding has been found extraditable to Italy in an extradition proceeding brought by the Republic of Italy. The Honorable Thomas P. Griesa, District Judge of this Court sitting as a committing magistrate under the provisions of 18 U.S.C. § 3184, decided in accordance with the Treaty of Extradition between the United States of America and the Republic of Italy [1] that probable cause had been established to believe the petitioner had committed the extraditable crime of fraudulent bankruptcy.[2] A comprehensive opinion dated May 18, 1978 is reported in *In re Sindona*, 450 F.Supp. 672 (S.D.N.Y.1978).

Since there is no direct appeal from the order of the committing magistrate, the only review available is by petition for writ of habeas corpus. *Jhirad v. Ferrandina*, 536 F.2d 478, 482 (2d Cir.), *cert. denied*, 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976); *Shapiro v. Ferrandina*, 478 F.2d 894, 901 (2d Cir.), *cert. dismissed*, 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973); *Jimenez v. Aristeguieta*, 290 F.2d 106 (5th Cir. 1961). We thus have the anomalous situation of a review by one district judge of the decision of another district judge.

That review however is limited, for "*habeas corpus* is available only to inquire whether the magistrate had jurisdiction, whether the offence charged is within the treaty and, by a somewhat liberal extension, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty." *Fernandez v. Phillips*, 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925).

These principles of review do not provide for a rehearing by the court deciding the habeas corpus petition. The habeas corpus petition is not a writ of error. The entire record of the extradition proceeding is now before the Court and has been examined by it. No issue of the magistrate's jurisdiction has been raised.

## FACTS

Petitioner is a 58-year old Italian businessman who owned or controlled two Italian banks located in Milan, Banca Privata

---

1. Treaty on Extradition Between the United States of America and Italy, 26 U.S.T. 493, T.I.A.S. No. 8052 ("the Treaty"). The Treaty was signed on January 18, 1973 and became effective March 11, 1975.

2. Subdivision 25 of Article II of the Treaty makes fraudulent bankruptcy an extraditable offense. The applicable Italian statutes are as follows:

216. (Fraudulent bankruptcy.)
A businessman is punished with imprisonment of from three to ten years, if declared to be bankrupt, when he:
1) has distracted, hidden, dissimulated, destroyed or dissipated all or part of his assets or, with the intent of damaging his creditors, has alleged or acknowledged the existence of nonexisting debts;

2) has subtracted, destroyed or falsified, wholly or partly, with the intent of procuring for himself or others an unjust profit or of damaging his creditors, the books and other accounting records or has so kept them as to make it impossible to reconstruct the assets or the transactions of the business . . . . .
223. (Acts of fraudulent bankruptcy).
The penalties provided in Article 216 are applied to the directors, the general managers, the auditors and the liquidators of companies which are declared to be bankrupt, who have committed any of the acts contemplated in the aforesaid article.
The penalty provided by the first sub-section of Article 216 is applied to the aforesaid persons when: . . .
2. they have caused by fraud or by the effects of fraudulent transactions the bankruptcy of the company.

Finanziaria ("BPF") and Banca Unione ("BU"). In 1960 he was elected to the board of directors and appointed vice president of BPF, and in 1973 he was appointed president of that bank. He became vice president and a director of BU in December 1968. He resigned as vice president of BU as of April 1978 but remained a director. Sindona owned or controlled 100% of the BPF and 51% of the BU shares.

On August 1, 1974, BU and BPF merged into a new entity, Banca Privata Italiana ("BPI"). Sindona was neither a director nor an officer of BPI. The record is unclear as to his continued roles in BU and BPF but Judge Griesa inferred that he remained a director of both until the merger.

On September 27, 1974 the Italian Ministry of the Treasury ordered BPI into liquidation and a liquidator was appointed.

BPI was declared insolvent by the Court of Milan on October 15, 1974. This judgment was affirmed by the Court of Appeal of Milan in July 1977 and by the Supreme Court of Italy on March 31, 1978.

An inspection of the records of BU was commenced by bank examiners of the Bank of Italy on July 1, 1974 to determine in part its position as of June 28, 1974. The examination was completed on October 1, 1974. This report and that of the liquidator of BPI concluded that approximately 180 billion lire (about $225 million)[3] deposited at BPI and its predecessors (BU and BPF) had been improperly and illegally diverted at Sindona's direction for his benefit and the benefit of companies which he controlled. These reports also disclose that the books and records of the banks had been falsified to conceal the actual beneficiaries of these transfers through a variety of complex devices. These devices included the recording of fictitious foreign exchange transactions, the nonrecording of other foreign exchange transactions, the fragmenting of transactions within the bank to conceal from officials the true nature of the transactions, the establishment of fictitious security to support credits granted to Sindona companies, and the creation of interbank time "deposits" with foreign banks which were not deposits but actually fiduciary accounts not callable within 48 hours as was indicated on the bank's books. In addition, BU's official balance sheet for December 31, 1973 was inaccurate because many large transactions were reflected only in "secret accountings" and not in the balance sheet.

A large number of the "fiduciary deposits" were made during the last half of 1973. These deposits were carried on the books of BU and BPF as interbank time deposits, many of them recallable on 48 hours notice. The books and records of the banks did not reflect in any way the fact that money had been loaned to Sindona companies nor did they indicate whether the beneficiaries were creditworthy. In early 1974 the transactions were altered so that "bridge companies" with no assets were substituted as the beneficiaries on the accounts with the foreign banks. Thus if the banks called these loans they were faced with companies which had not received the money and which were without assets to repay the loans.

The funds deposited were deposited principally with Amincor Bank of Zurich. After a deposit the foreign banks would be instructed to credit the funds to beneficiaries which were actually foreign companies controlled by Sindona.

Both reports concluded that the device of substituting the bridge companies was used because Sindona never intended to repay the funds transferred to fiduciary accounts. The liquidator's report stated that this device was designed to prevent bankruptcy authorities from discovering the true beneficiaries of the funds. It should be noted that only certain employees of the foreign departments of BU and BPF could identify through the use of coded cards the true beneficiaries of the fiduciary accounts.

Improper foreign exchange transactions also caused large losses. These transactions included devices that concealed losses and made them appear as assets in time deposits with foreign banks. Simulated foreign ex-

---

3. Judge Griesa used an exchange rate of 650 lire to the dollar. 450 F.Supp. at 682 n.5.

change transactions and contracts at prices not current at the time were also utilized, as well as some transactions which appear to have been engaged in for the purpose of causing loss to the banks in favor of the other party.

The report of the bank examiners concluded that the corporate bodies of BU were controlled by Sindona and Carlo Bordoni, BU's managing director, and that Sindona controlled Bordoni.

As of June 28, 1974 BU's losses totalled 111 billion lire ($171 million), of which 88.6 billion lire ($136 million) was the result of fiduciary deposits in favor of Sindona's companies. Over 30 billion lire ($46 million) in losses had been caused by certain foreign exchange transactions. The total losses caused by fiduciary deposits and foreign exchange transactions amounted to 118 billion lire ($182 million).

As of September 27, 1974 BU's deficit balance was 200 billion lire ($307 million). According to the liquidator's report the principal reason for the deficit was the fiduciary deposits and improper foreign exchange transactions.

The conclusions of the liquidator and the bank examiners were largely confirmed by Nicola Biase, a newly employed manager of BPF, as a result of an independent investigation made by him in July 1974. In addition, a report by one Silvano Pontello, an employee of BPF to whom a balance sheet showing the "global assets and liabilities of the Sindona group" was dictated by Sindona in early July 1974, listed total liabilities of 133.7 billion lire ($205.7 million) to the bank.

The bank examiners inspection in July caused rumors about BU to appear in the press and generated withdrawals of 40 billion lire ($61 million) between July 1 and July 15. Between September 13 and 27 after the merger into BPI an additional 219 billion lire ($337 million) was withdrawn and the liquidation of BPI was ordered.

These are essentially the facts found by Judge Griesa and upon which he based his probable cause conclusion. 450 F.Supp. at 674–75, 680–84.

## THE PETITION FOR HABEAS CORPUS

Petitioner alleges as grounds for this application the following:

4. Petitioner is unlawfully restrained of his liberty and in unlawful custody of respondent in that the magistrate denied petitioner the public hearing prescribed by 18 U.S.C. § 3189 and arbitrarily and improperly limited the evidence and the subjects upon which he was willing to receive evidence.

5. The restraint is further unlawful in that the evidence introduced during the proceeding for petitioner's extradition was not sufficient "to justify committal for trial," as required by Article V of the Treaty on Extradition between the United States and Italy (the "Treaty").

6. The restraint is further unlawful in that no competent and admissible evidence was introduced during the proceeding for petitioner's extradition to sustain the charges upon which the extradition was sought, within the meaning of 18 U.S.C. § 3184 and the Treaty.

7. The restraint is further unlawful in that the magistrate conducting the extradition proceeding denied petitioner an opportunity to present evidence by way of explanation.

8. The restraint is further unlawful in that the charges upon which the extradition of petitioner is being sought are offenses of political character exempt from extradition under Article VI of the Treaty and thus are not extraditable offenses within the terms of the Treaty.

9. The restraint is further unlawful in that petitioner's extradition is being sought to punish petitioner for his political beliefs in violation of his right to be free from political persecution recognized in Article 33 of the United Nations Convention and Protocol Relating to the Status of Refugees (the "U.N. Convention").

10. The restraint is further unlawful in that the magistrate refused to hear and consider evidence of political persecution relevant under the U.N. Convention

and denied petitioner the opportunity to call witnesses to support his claims of political persecution.

11. The restraint is further unlawful in that the magistrate refused to hear and consider evidence showing that petitioner faces death or grave bodily harm if returned to Italy.

12. The restraint is further unlawful in that notwithstanding the provision of Article XV of the Treaty which prohibits the trial of any accused "for any offense other than that for which extradition has been granted," the magistrate made no determination as to which offenses or portions of the offenses with which petitioner has been charged in the Republic of Italy form the basis of his certification of extraditability, although one charge is admittedly a non-extraditable offense and no proof was introduced with respect to large portions of the other charges.

*Paragraphs 4 and 7 of the Petition*

■ Sindona contends that he was wrongfully denied both a hearing and a fair opportunity to present evidence at the extradition proceeding. I disagree.

■ It is a principle of international extradition that no plenary trial is to be held before the committing magistrate. The purpose of an extradition proceeding is not to determine guilt or innocence. Rather, the committing magistrate's duty is to determine whether there is sufficient evidence to justify committing the accused for trial. *Shapiro v. Ferrandina, supra,* 478 F.2d at 900–01; *Jimenez v. Aristeguieta,* 311 F.2d 547, 562 (5th Cir. 1962), *cert. denied sub nom. Jimenez v. Nixon,* 373 U.S. 914, 83 S.Ct. 1302, 10 L.Ed.2d 415 (1963). In reaching such a determination, the magistrate is obligated only to receive evidence offered

by the accused that explains the demanding country's proof. The accused has no right, however, to present evidence which merely contradicts the demanding country's proof or which poses a question of credibility. *Collins v. Loisel,* 259 U.S. 309, 315–16, 42 S.Ct. 469, 66 L.Ed. 956 (1922); *Charlton v. Kelly,* 229 U.S. 447, 461, 33 S.Ct. 945, 57 L.Ed. 1274 (1913); *Shapiro v. Ferrandina, supra,* 478 F.2d at 901; *Jimenez v. Aristeguieta, supra,* 311 F.2d at 556. *See also In re D'Amico,* 185 F.Supp. 925, 929–30 (S.D.N.Y.1960).[4]

The magistrate over a period of months patiently and painstakingly permitted both sides to submit their contentions and offers of proof in writing and orally on the record in open court. The affidavits and depositions submitted by Sindona were in fact reviewed by Judge Griesa. 450 F.Supp. at 687. Petitioner's offers in essence were to the effect (1) that the deposits in foreign banks, which were later diverted by way of the fiduciary account method, were intended to pay off foreigners who had subscribed for participation in a low cost housing scheme which did not receive requisite government approval; (2) that this method was used rather than a sale of stock because such a sale would have adversely affected the value of the lire and consequently the economy of Italy; (3) that the deposits were in truth loans which were fully collateralized by the pledge of the shares; (4) that other loans arranged by Sindona would have paid off these loans and restored solvency to the bank but that the rumors about insolvency caused a "run" which no bank could withstand.

■ These offers were correctly rejected by Judge Griesa. They each contradict the charges made and in no way explain the

---

4. The *D'Amico* case provides a good practical example of the type of explanatory evidence that is admissible in an extradition hearing. In that case D'Amico had been found extraditable in a proceeding brought by Italy for the crimes of kidnapping and robbery. The evidence against D'Amico consisted of the confessions of two alleged accomplices that had been retracted and evidence that the victim had been held in a shack on property owned by D'Amico.

D'Amico's offer of proof consisted of evidence that the shack, while on his property, was in an isolated area some seven or eight miles from his residence and was rarely visited. Such evidence certainly could have explained why the victim was in D'Amico's shack without D'Amico's knowledge, and the remaining evidence against D'Amico would have consisted solely of the two recanted confessions. 185 F.Supp. at 929–30.

absence of bank records that would have reflected the true nature of many of the transactions. A judge sitting as a committing magistrate is not required to hear testimony that would not explain the charges so as to render the allegations and evidence submitted by the requesting country of little probative value. Further, the proffer of testimonial evidence appears to have been limited to Sindona, who was not willing to testify unless the United States Attorney agreed to limitations that were not acceptable. Under such conditions, the hearings in open court were sufficient.

In the limited review of the committing magistrate's decision permitted upon habeas corpus, the question addressed is not whether evidence was arbitrarily excluded but whether, even assuming that it was, would that evidence have been of such a nature as to result in a finding that there was no probable cause. I have found that it would not.

### Paragraph 5 of the Petition

■ Petitioner argued before the magistrate and in his brief submitted to this Court that the standard to be applied in determining extraditability under this Treaty is the standard sufficient to support an indictment. In essence, Sindona contends that the Italian Government had to prove a *prima facie* case. Judge Griesa, however, disagreed and applied a probable cause standard.

The starting point is Article V of the Treaty, which provides in part:

"Extradition shall be granted only if the evidence be found sufficient, according to the laws of the requested Party . . . to justify his committal for trial if the offense of which he is accused had been committed in its territory. . . ."

This very same language was at issue in *Greci v. Birknes*, 527 F.2d 956 (1st Cir. 1976), and the First Circuit found that the Italian and American delegations who drafted the treaty intended the federal probable cause standard to apply to the question of whether the evidence was sufficient to warrant extradition. 527 F.2d at 958–59. I am of the opinion that this is the proper standard to apply and adopt the history and reasoning set forth in the *Greci* case, where this problem with respect to this treaty was faced for the first time.

### Paragraph 6 of the Petition

The admissibility of documents submitted with the complaint for extradition is governed by 18 U.S.C. § 3190 and Article XI of the Treaty. Petitioner contends that the documents submitted here did not comply. with those requirements and consequently were not admissible.

Section 3190 provides:

"Depositions, warrants, or other papers or copies thereof offered in evidence upon the hearing of any extradition case shall be received and admitted as evidence on such hearing for all the purposes of such hearing if they shall be properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped, and the certificate of the principal diplomatic or consular officer of the United States resident in such foreign county shall be proof that the same, so offered, are authenticated in the manner required."

Article XI of the Treaty provides in pertinent part:

"The request for extradition shall be made through the diplomatic channel.

"The request shall be accompanied by a description of the person sought, a statement of the facts of the case, the text of the applicable laws of the requesting Party including the law defining the offense, the law prescribing the punishment for the offense, and the law relating to the limitation of the legal proceedings or the enforcement of the penalty for the offense.

"When the request relates to a person who has not yet been convicted, it must also be accompanied by a warrant of arrest issued by a judge or other judicial officer of the requesting Party and by

such evidence as, according to the laws of the requested Party, would justify his arrest and committal for trial if the offense had been committed there, including evidence proving that the person requested is the person to whom the warrant of arrest refers. . . .

"The warrant of arrest . . . or other evidence, given under oath, and the judicial documents establishing the existence of the conviction, or certified copies of these documents, shall be admitted in evidence in the examination of the request for extradition when, in the case of a request emanating from Italy, they bear the signature or are accompanied by the attestation of a judge, magistrate or other official or are authenticated by the official seal of the Ministry of Justice and, in any case, are certified by the principal diplomatic or consular officer of the United States in Italy, . . . . Any deposition or other evidence which has not been given under oath but which otherwise meets the requirements set forth in this paragraph shall be admitted in evidence as a deposition or evidence given under oath when there is an indication that the person, prior to deposing before the judicial authorities of the requesting Party, was informed by those authorities of the penal sanctions to which he would be subject in the case of false or incomplete statements."

The magistrate interpreted the treaty as requiring depositions or other evidence to be given either under oath or with an indication that the witness, prior to being deposed, had been informed of the penal sanctions to which he would be subject in the case of false or incomplete statements. 450 F.Supp. at 679–80. These are in fact the requirements set forth in the last sentence of Article XI of the Treaty. *Greci v. Birknes*, 527 F.2d 956, 960 (1st Cir. 1976). Several enclosures were originally submitted without either an oath or a warning of penal sanctions. Subsequently the Government submitted properly authenticated documents which gave "an indication" that the persons giving evidence had previously been warned of the penal sanctions.

■ Sindona's claims with respect to the statement of Giorgio Ambrosoli, the liquidator of BPI, and his report (Enclosures Nos. 6, 18) are groundless. Ambrosoli's statement that "on occasion of my previous examinations as witness I was always warned . . . and was always conscious of the criminal consequence incurred by me in case of false statements on my part" was sufficient under the requirements.

Similarly, I find that the requirements were met with respect to the deposition of Nicola Biase (Enclosure No. 2), the report on the Inspection of BU by the Bank of Italy (Enclosure No. 4), the statement by the Milan public prosecutor (Enclosure No. 9, at 4) that Bonocossa was warned of the penalties of perjury prior to the giving of his statement, and Bonacossa's entire deposition (Enclosure No. 7). I take it that the public prosecutor is one of those "other officials" mentioned in Article XI whose attestation is sufficient to lend authenticity to a document. Furthermore the certificates of the Italian Ministry of Justice and the principal United States Consular Officer attesting to admissibility lay to rest the issue of admissibility in the tribunals of Italy. The certificate of the consular officer is conclusive and contradictory evidence is properly rejected. If the documents are properly authenticated they are admissible. *Galanis v. Pallanck*, 568 F.2d 234, 240 (2d Cir. 1977); *Shapiro v. Ferrandina, supra*, 478 F.2d at 903.

■ Petitioner contends that certain documents were inadmissible because they refer to attachments which were not included. This contention is rejected since it goes to weight and credibility which cannot be reviewed by this Court on the habeas petition. *Shapiro v. Ferrandina, supra*, 478 F.2d at 905. These reports by the bank examiners and the liquidator were based upon detailed and thorough investigation and were corroborated by other depositions. They were not "extracts." To require that each document involving a bankruptcy be included in a bank examiner's or liquidator's report as

an exhibit to a complaint in extradition would defeat the purpose of the Treaty and require the standard already rejected— proof of a prima facie case.

The document accompanying Pontello's statement (Enclosure No. 5) is partially illegible, as is the English translation. However, as the Government points out, Pontello fully sets forth in his deposition the origin, significance and explanation of that document so that once again only weight and credibility are affected.

Although I differ with Judge Griesa's exclusion of the Enclosures 10–17 on the ground that in Italy an accused person is subject to penal sanction only if he falsely states his identity, I am of opinion that these statements were given under the only penal warning available to the Italian magistrate and should have been admitted here after authentication certificates had been attached. Insofar as this proceeding is concerned, the documents excluded were largely cumulative and corroborative and not essential to the finding ultimately made, nor were they exculpatory.

In my opinion there is no question that the evidence contained in Enclosures No. 1–9 established that BPI was a bankrupt and that Sindona was a director within the meaning of the fraudulent bankruptcy statute. His intent was a fact to be inferred from the evidence. It cannot be said that the inference which was drawn by the magistrate was incorrect.

### Paragraphs 8, 9, 10 and 11

Under Article VI(5) of the Treaty, extradition is not permitted for offenses of a political character or when the request has been made with a view to trying or punishing the person for an offense of a political character.

■ While the question of whether an offense is of a political character is a mixed question of law and fact, it is chiefly one of fact to be resolved on the evidence, and as such it is not reviewable by this Court. *Ornelas v. Ruiz,* 161 U.S. 502, 509, 16 S.Ct. 689, 40 L.Ed. 787 (1896); *Jimenez v. Ariste-*

*guieta, supra,* 311 F.2d at 559; *United States ex rel. Karadzole v. Artukoric,* 170 F.Supp. 383, 393 (S.D.Cal.1959). Even so, there is no doubt in my mind that the charges against Sindona do not fall within the political offense exception.

■ Sindona's contention that the request for extradition was politically motivated is similarly unconvincing, for the motives of the requesting country are not within the jurisdiction of the Court but are reserved for the province of the Secretary of State. *Garcia-Guillern v. United States,* 450 F.2d 1189, 1192 (5th Cir. 1971), *cert. denied,* 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972); *In re Lincoln,* 288 F. 70, 74 (E.D.N.Y.1915), *aff'd per curiam,* 241 U.S. 651, 36 S.Ct. 721, 60 L.Ed. 1222 (1916).

■ Moreover, it is clear that Sindona falls within the "serious crimes" exception of the United Nations Convention Relating to the Status of Refugees, 19 U.S.T. 6259, T.I.A.S. No. 6577, which provides that the convention shall not apply to any person with respect to whom there are serious reasons for considering that

"(b) he has committed a serious non-political crime outside of the country of refuge prior to his admission to that country as a refugee. . . ." *Id.* Art. 1(F)(b).

Finally, Sindona contends that he faces grave bodily harm if he is returned to Italy. This matter is also exclusively within the discretion of the Secretary of State, who can deny extradition on humanitarian grounds if it appears that the petitioner faces danger or that the Treaty is not being respected and carried out. *Peroff v. Hylton,* 542 F.2d 1247, 1249 (4th Cir. 1976), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 787, 50 L.Ed.2d 778 (1977). *See also Shapiro v. Secretary of State,* 162 U.S.App.D.C. 391, 395, 499 F.2d 527, 531 (1974), *aff'd,* 424 U.S. 614, 96 S.Ct. 1062, 47 L.Ed.2d 278 (1976); *Wacker v. Bisson,* 348 F.2d 602, 606 (5th Cir. 1965).

### Paragraph 12 of the Petition

■ Sindona's claim that the magistrate failed to specify the offense for which he

was certifying extraditability, *Shapiro v. Ferrardina, supra,* is completely without merit. Judge Griesa fully met his duty to define the charges against the petitioner and specifically found that the evidence was sufficient to establish probable cause that Sindona had committed the crime of fraudulent bankruptcy, as defined by Articles 216 and 223 of the Italian Bankruptcy Law. 450 F.Supp. at 687–88.

### The Due Process Claims

█ Petitioner in his reply memorandum in this proceeding raises due process issues with respect to certain civil actions, pending in the United States District Court for the Eastern District of New York. Sindona is a defendant in these actions, some of which have been pending since 1974. He has also been advised that he is a target of a grand jury sitting in the Southern District of New York and that he is named as an unindicted co-conspirator in a criminal proceeding.

By reason of the pendency of these matters, Sindona contends that his extradition should be delayed until either the criminal and civil suits have been concluded or until his assistance is no longer required by counsel. Otherwise, he alleges, his due process rights under the fifth amendment will be violated.

While the due process clause of the fifth amendment guarantees an individual the right to be heard before he can be deprived of his life, liberty or property, *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), which includes the right of access to the courts, *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), it does not grant immunity to an individual who falls within the category of persons extraditable under treaties existing between this country and friendly nations.

I consequently find no merit in petitioner's contentions.

### CONCLUSION

The certificate of extraditability was correctly issued. The petition for writ of habeas corpus is denied.

**SO ORDERED.**