John Peter GALANIS,
Petitioner-Appellant,

v.

Ermen PALLANCK, U.S. Marshal for the District of Connecticut,
Respondent-Appellee.

No. 376, Docket 77-2083.

United States Court of Appeals,
Second Circuit.

Argued Oct. 18, 1977.

Decided Nov. 22, 1977.

---

John S. Martin, Jr., New York City (Paul R. Grand, Carolyn H. Henneman, Francis H. Wright, Martin, Obermaier & Morvillo and Grand & Ostrow, New York City, of counsel), for petitioner-appellant.

Raymond L. Sweigart, Asst. U.S. Atty., New Haven, Conn. (Richard Blumenthal, U.S. Atty., D.Conn., New Haven, Conn., of counsel), for respondent-appellee.

Before MOORE, FRIENDLY and TIMBERS, Circuit Judges.

FRIENDLY, Circuit Judge:

On September 1, 1976, the United States applied to the District Court of Connecticut, pursuant to 18 U.S.C. § 3184, for a warrant requiring John Peter Galanis, a United States citizen residing in Connecticut, to be brought before the court for a hearing to determine whether there was sufficient evidence to sustain a 1973 charge by the Government of Canada that Galanis had defrauded Champion Securities Corp., Ltd. (Champion) and its creditors of securities valued at 1.6 million Canadian dollars in 1971 and 1972. After a hearing, Judge Newman rendered an opinion certifying that there was. He ordered that Galanis remain in the custody of the United States marshal and that a copy of the certification and order be forwarded to the Secretary of State so that an extradition warrant might issue upon requisition by the Canadian Government, 429 F.Supp. 1215, 1231. There being no avenue for appeal from Judge Newman's order, Galanis sought a writ of habeas corpus, see *Shapiro v. Ferrandina*, 478 F.2d 894, 901 (2 Cir.), *cert. dismissed*, 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973). Judge Zampano denied his petition and this appeal followed.

Galanis attacks the order denying his petition on four grounds, all of which were rejected by the judges below:

(1) The United States is precluded from prosecuting an extradition proceeding

against Galanis by an "informal"[1] grant of "transactional" immunity as part of an agreement whereby Galanis, who was the subject of various federal indictments, would be allowed to plead guilty to only two indictments with a maximum penalty of 10 years imprisonment and $20,000 fines in return for his cooperating with the Government—as he concededly did.

(2) Even if the informal grant was only of "use" immunity, the United States failed to meet its burden of showing that the evidence submitted in support of extradition was not derived from information supplied by Galanis.

(3) Galanis is not extraditable under the currently effective extradition treaty between the United States and Canada, United States Treaties and Other International Agreements Series (TIAS) 8237, since Art. 4(1)(i) prohibits the grant of extradition when the person whose surrender is sought "has been tried and discharged or punished in the territory of the requested State for the offense for which his extradition is requested."

(4) The evidence of probable cause was not authenticated in the manner required by 18 U.S.C. § 3190.

We uphold Galanis' third argument, based upon the extradition treaty, and therefore reverse.

The Government does not challenge Galanis' factual assertion that he "has been tried and discharged or punished" in the United States "for the offense for which his extradition is requested" by Canada. Although the indictments to which Galanis pleaded guilty and on which he received sentences of six months' imprisonment and five years' probation did not involve the Champion fraud, the Assistant United States Attorney in charge of the prosecutions against Galanis testified that the guilty pleas were intended to cover every fraudulent involvement that Galanis had that came within the jurisdiction of the U.S. Department of Justice," specifically including the Champion fraud. The Government's answer is rather that Galanis' extraditability is governed not by the currently effective treaty but by the earlier one, as supplemented, which had no such "double jeopardy" provision as Art. 4(1)(i).

Prior to the present treaty, extradition between the United States and Canada was governed by Article X of the Webster-Ashburton Treaty of 1842 between the United States and Great Britain, 8 Stat. 572, TS 119, 12 Bevans 82, a rudimentary one-paragraph provision which listed only seven extraditable offenses, as modified by six supplementary agreements between this country and Great Britain and Canada.[2] The objective of the present treaty, signed on December 3, 1971, was to replace this unsatisfactory situation with a new treaty containing a greatly expanded list of extradita-

---

1. Apparently this adjective connotes a grant of immunity other than those provided for in Part V of 18 U.S.C. §§ 6001–05 and incident to plea bargaining. See *United States v. Librach*, 536 F.2d 1228, 1230 (8 Cir.), *cert. denied*, 429 U.S. 939, 97 S.Ct. 354, 50 L.Ed.2d 308 (1976).

2. The Convention of 1889 Between the United States and Great Britain, 26 Stat. 1508, TS 139, 12 Bevans 211, added certain substantive protections for extraditees, as well as 10 extraditable offenses. Subsequent conventions, Supplementary Extradition Convention of 1900, 32 Stat. 1864, TS 391, 12 Bevans 256; Supplementary Extradition Convention of 1905, 34 Stat. 2903, TS 458, 12 Bevans 272; Supplementary Extradition Convention of 1922, 42 Stat. 2224, TS 666, 12 Bevans 392; Convention of 1925 to Provide for Extradition on Account of Crimes or Offenses Against Narcotic Laws, 44 Stat.

2100, TS 719, 6 Bevans 5; Supplementary Convention of 1952 to the Supplementary Convention Between the United States and the United Kingdom for the Mutual Extradition of Fugitive Criminals Signed at Washington, December 13, 1900, 3 UST 2826, TIAS 2454, also added extraditable offenses. See Timbers & Pollack, *Extradition from Canada to the United States for Securities Fraud: Frustration of the National Policies of Both Countries*, 24 Fordham L.Rev. 301, 305–13 (1955). A related treaty in 1908 provided for conveyance of prisoners by officers of the United States or Canada through the territory of the other country. Treaty Between the United States and Great Britain Concerning Reciprocal Rights for United States and Canada in the Conveyance of Prisoners and Wrecking and Salvage, 35 Stat. 2035, TS 502, 12 Bevans 314.

ble crimes.[3] As President Ford stated in submitting the treaty to the Senate, the purpose was to effect a "modernization of the extradition relations between the United States and Canada." Message from the President Transmitting the Treaty on Extradition Between the United States and Canada, Sen.Exec.Doc. G, 93d Cong., 2d Sess. III (1974). Article 18(3) provided that the treaty "shall enter into force upon the exchange of ratifications," which was March 22, 1976. Article 18(2) provided:

This Treaty shall terminate and replace any extradition agreements and provisions on extradition in any other agreement in force between the United States and Canada; except that the crimes listed in such agreements and committed prior to entry into force of this Treaty shall be subject to extradition pursuant to the provisions of such agreements.[4]

The Government contended, and the district judges agreed, that the "except" clause prevented Galanis from relying on the "double jeopardy" defense conferred by Art. 4(1)(i).

Although such a reading would be permissible and perhaps would adhere more closely to the letter of the "except" clause than that urged by Galanis, it is not the only reasonable reading. The purpose of the draftsmen seems to have been two-fold—to make clear that no one who was extraditable under previous treaties should be able to gain immunity because these were "terminate[d]" by the 1971 treaty, and that perpetrators of the many crimes not previously extraditable, see fn. 3, should not become so by virtue of the new treaty. Presumably the draftsmen were aware of the long-established rule that "extradition treaties, unless they contain a clause to the contrary, cover offenses committed prior to their conclusion." *Gallina v. Fraser*, 177 F.Supp. 856, 864 (D.Conn.1959), *aff'd*, 278 F.2d 77 (2 Cir.), *cert. denied*, 364 U.S. 851, 81 S.Ct. 97, 5 L.Ed.2d 74 (1960), see also *United States ex rel. Oppenheim v. Hecht*, 16 F.2d 955, 956–57 (2 Cir.), *cert. denied*, 273 U.S. 769, 47 S.Ct. 572, 71 L.Ed. 883 (1927);

**3.** These were:
1. Involuntary manslaughter.
2. Wounding, maiming, or assault occasioning bodily harm.
3. Unlawful throwing or application of any corrosive substances at or upon the person of another.
4. Indecent assault.
5. Unlawful sexual acts with or upon children under the age specified by the laws of both the requested and requesting States.
6. False imprisonment.
7. Assault with intent to steal.
8. Extortion.
9. Making a false affidavit or statutory declaration for any extrajudicial purpose.
10. Any act done with intent to endanger the safety of any person traveling in any aircraft or vessel or other means of transportation other than by railway.
11. Any unlawful seizure or exercise of control an aircraft, by force or violence or threat of force or violence, or by any other form of intimidation, on board such aircraft.
12. Willful injury to property.
13. Offenses against federal laws relating to the sale or purchase of securities.
14. Making or having in possession any explosive substance with intent to endanger life, or to cause severe damage to property.
15. Obstructing the course of justice in a judicial proceeding, existing or proposed, by:

(a) dissuading or attempting to dissuade a person by threats, bribes, or other corrupt means from giving evidence;
(b) influencing or attempting to influence by threat, bribes, or other corrupt means a person in his conduct as a juror; or
(c) accepting a bribe or other corrupt consideration to abstain from giving evidence or to do or to refrain from doing anything as a juror.

In addition, Article 2(2) of the 1971 Treaty provides that extradition shall be granted for "attempts to commit, conspiracy to commit or being a party to" any of the scheduled offenses. Article 2(3) mandates extradition for any offense against the law of the United States in which a scheduled offense or an offense made extraditable by Article 2(2) is a substantial element.

**4.** The French version of Article 18(2), which is "equally authentic," reads:

2) Le présent Traité terminera et remplacera tous accords d'extradition en vigueur entre les Etats-Unis et le Canada et toutes dispositions relatives à l'extradition contenues dans tout autre accord en vigueur entre eux; toutefois, les infractions énumérées dans ces accords et commises avant l'entré en vigueur de présent Traité seront passibles d'extradition en application des dispositions de ces accords.

We discern no significant difference in meaning between the English and French versions.

*Cleugh v. Strakosch*, 109 F.2d 330, 335 (9 Cir. 1940); 1 *Moore, Extradition* § 86 (1891); 6 *Whiteman, Digest of International Law* § 11, at 753–57 (1968). The language of the treaty with Canada was in contrast with a number of recent treaties which expressly apply to certain offenses not previously extraditable that were committed before the effective date of the new treaty, e. g., the Treaty on Extradition Between the United States and New Zealand, 22 UST 1, TIAS 7035 (1970); Treaty on Extradition Between the United States and Paraguay, 25 UST 967, TIAS 7838 (1974); Treaty on Extradition Between the United States and Italy, 26 UST 493, TIAS 8052 (1975); Treaty on Extradition Between the United States and Australia, TIAS 8234 (1976). Thus, the prime objective of the language in Article 18(2) of the treaty with Canada was to preclude such *ex post facto* designation of offenses as extraditable.[5]

█ Moreover, since the objective of the Treaty was to modernize "extradition relations," we do not see any reasons, and the Government has pointed out none, why the draftsmen should have wished to deprive a person whose extradition was sought after the treaty's effective date of the double jeopardy defense here asserted, or of the other defense in the same clause, namely, that he was currently being proceeded against in the requested state,[6] or of the

defense, Art. 4(1)(ii), that prosecution has been barred by lapse of time in the requesting state. Protection against double jeopardy has become "common to most extradition treaties," 6 *Whiteman, supra,* § 40. Provisions on this subject similar to that in Art. 4(1)(i) will be found in such treaties as the Treaty Relating to the Reciprocal Extradition of Criminals Between the United States and the Union of South Africa, 2 UST 884, TIAS 2243 (1951); Convention Relating to Extradition Between the United States and Israel, 14 UST 1707, TIAS 5476 (1963); Convention on Extradition Between the United States and Sweden, 14 UST 1845, TIAS 5496 (1963); Treaty on Extradition Between the United States and New Zealand, 22 UST 1, TIAS 7035 (1970); Supplementary Extradition Convention to the Convention of 1909 Between the United States and France, 22 UST 407, TIAS 7075 (1971); Treaty on Extradition Between the United States and Argentina, 23 UST 3501, TIAS 7510 (1972); Treaty on Extradition Between the United States and Denmark, 25 UST 1293, TIAS 7864 (1974); Treaty on Extradition Between the United States and Italy, 26 UST 493, TIAS 8052 (1975); Treaty on Extradition Between the United States and Australia, TIAS 8234 (1976).

The position thus adopted by the Department of State with respect to our relations with foreign nations accords with the policy

5. Almost identical language in the Treaty on Extradition Between the United States and Spain, 22 UST 737, TIAS 7136 (1971), has been so interpreted. In *United States v. Flores*, 538 F.2d 939 (2 Cir. 1976), the defendant was indicted in this country in 1973 for conspiracy to violate the narcotics laws in the period between January 1, 1968 and April 30, 1971. The defendant was in Spain at the time of the indictment. Violation of the narcotics laws had not been an extraditable offense under the previous treaty with Spain until September 3, 1970, when that treaty was amended by Spain's ratification of the Geneva Convention of 1936 for the Suppression of Illicit Traffic in Dangerous Drugs, and the extradition treaty now in force did not become effective until June 16, 1971. The High Court of Spain, in proceedings in November 1973, granted extradition only for offenses committed between September 3, 1970, and April 30, 1971, stating:

The defense argument concludes with the statement that [during the period between January 1968 and April 30, 1971] neither the Treaty of 1904 nor the Treaty of 1970, now in force, was applicable. With respect to the Extradition Treaty of May 29, 1970, between Spain and the United States of America, in force since June 16, 1971, that statement is correct, and therefore the objection based on the lack of retroactive effects of the said Treaty is pertinent and admissible . . . .
*United States v. Flores, supra* (Government Appendix at 55A). The limitation on what offenses could be prosecuted was not challenged in this court, and we held only that evidence of offenses committed prior to the effective date of the new treaty was admissible. See also Treaty on Extradition Between the United States and Argentina, 23 UST 3501, TIAS 7510 (1972) (similar provision).

6. This exception, of course, is important to the requested state as well as to the extraditee.

adopted by the Department of Justice in response to concerns expressed by the Supreme Court in the federal-state context. In *United States v. Lanza*, 260 U.S. 377, 383, 43 S.Ct. 141, 67 L.Ed. 314 (1922), Chief Justice Taft quoted the following passage from *Fox v. Ohio*, 46 U.S. 410, 5 How. 410, 435, 12 L.Ed. 213 (1847):

It is almost certain, that, in the benignant spirit in which the institutions both of the state and federal systems are administered, an offender who should have suffered the penalties denounced by the one would not be subjected a second time to punishment by the other for acts essentially the same, unless indeed this might occur in instances of peculiar enormity, or where the public safety demanded extraordinary rigor.

In response to that concern, the Department of Justice adopted a policy against duplicative federal-state prosecutions, unless there are compelling reasons for prosecution. The Department found this to be dictated by "considerations both of fairness to defendants and of efficient and orderly law enforcement." *Petite v. United States*, 361 U.S. 529, 530–31, 80 S.Ct. 450, 451, 4 L.Ed.2d 490 (1960). The Court has been receptive to the Department's attempts to implement its policy, holding very recently, in a case where a federal prosecution had been initiated in fear that a state conviction for the same conduct might be reversed, that a defendant "should receive the benefit of the policy whenever its application is urged by the Government." *Rinaldi v. United States*, —— U.S. ——, ——, 98 S.Ct. 81, 86, 54 L.Ed.2d 207 (1977). See also *Hayles v. United States*, 419 U.S. 892, 95 S.Ct. 168, 42 L.Ed.2d 136 (1974); *Ackerson v. United States*, 419 U.S. 1099, 95 S.Ct. 769, 42 L.Ed.2d 796 (1975); *Watts v. United States*, 422 U.S. 1032, 95 S.Ct. 2648, 45 L.Ed.2d 688 (1975).

▮ In view of the deep considerations of policy that must have moved the draftsmen to include the double jeopardy provi-

sion in this treaty, it would seem reasonable to conclude that they did not wish to defer the obligation of this country to respect it, but rather wished this and other improvements implemented by the 1971 treaty to become operative as soon as the treaty became effective. Judge Newman rested his contrary construction not only on the letter of the "except" clause in Article 18(2) but on two other considerations which he deemed persuasive. One was a sentence in a letter from Robert S. Ingersoll, Acting Secretary of State, submitting the treaty to the President, see Message from the President of the United States, *supra*, at VI stating, "The Treaty is not retroactive in effect." We find this altogether inconclusive; it could mean no more than that despite the contrary general rule and the practice in some other recent treaties, the enlargement in the list of extraditable crimes would not subject to extradition persons who had committed such crimes prior to the effective date of the new treaty. The second was an affidavit by K. E. Malmborg, Assistant Legal Adviser for Management in the Office of the Legal Adviser, Department of State, asserting, in conclusory fashion that it was his "understanding of Article 18" that "all of the provisions on extradition in other agreements in force prior to the 1971 treaty, and not the provisions of the 1971 treaty, apply to crimes listed in such other agreements which were committed prior to March 22, 1976." While the views of the State Department are entitled to respect, see, e. g., *Factor v. Laubenheimer*, 290 U.S. 276, 295, 54 S.Ct. 191, 78 L.Ed. 315 (1933), they are not controlling. See *Greci v. Birkners*, 527 F.2d 956, 960 (1 Cir. 1976), in which the court rejected a much more convincing affidavit by Mr. Malmborg. We therefore hold that the double jeopardy clause of the 1971 treaty applies in all proceedings begun after the exchange of ratifications even though the crime occurred before. Whether it would apply in a proceeding brought before the exchange but not yet concluded, we need not decide.[7]

---

7. Canada requested extradition on December 10, 1974, but extradition proceedings were not actually commenced until September 1, 1976.

■ While this ruling disposes of the case, we should add a word, in order to prevent confusion in the future, concerning discussion by both district judges of Galanis' claim that, despite consular certification admittedly sufficient under the final clause of 18 U.S.C. § 3190,[8] language in our opinion in *Shapiro v. Ferrandina, supra,* 478 F.2d at 903–04, permitted Galanis to offer proof that statements made by a witness in Zurich, Switzerland, before a Swiss police officer and a Canadian securities official, and depositions and accompanying exhibits taken in Canada in connection with the investigation of the Champion fraud, had not in fact been "properly and legally authenticated so as to entitle them to be received and admitted as evidence" in a Canadian preliminary examination. Having cited early cases which construed what is now § 3190 as making the diplomatic or consular certificate conclusive, *In re Fowler,* 4 F. 303, 311 (S.D.N.Y.1880); *In re Behrendt,* 22 F. 699, 700 (S.D.N.Y.1884); *In re McPhun,* 30 F. 57, 60 (S.D.N.Y.1887); and *Ex parte Schorer,* 197 F. 67, 72 (E.D.Wis.1912), Judge Newman referred, 429 F.Supp. at 1228, to "arguably conflicting statements" in *Shapiro,* and Judge Zampano thought "that certain dictum in *Shapiro v. Ferrandina, supra,* arguably casts doubt on the competency" of the exhibits received at the extradition hearing.

No statements in *Shapiro* qualify for these characterizations. The difficulty in that case arose from the fact that the certificate of the American Ambassador to Israel did not include the evidentiary material about Shapiro's guilt on which the Government necessarily relied. We expressly recognized that the certification was conclusive as to all matters that came within it, as indeed Shapiro had conceded, 478 F.2d at 903–04. It was with respect to the documents *not* formally within the certificate

that we said that "in the absence of any showing that the documents were not authentic or not of the sort admissible in Israel for the purposes of establishing the sufficiency of the evidence, we are unwilling to order Shapiro's release pending more satisfactory certification." *Id.* at 904. We fail to see anything in this that even "arguably" casts doubt on the conclusive effect of certification.

The order denying the writ of habeas corpus is reversed and Judge Zampano is directed to issue it, see *Shapiro v. Ferrandina, supra,* 478 F.2d at 914. While we have no power on this appeal to direct Judge Newman to alter his certification, we assume that he will promptly advise the Department of State of our decision and that no extradition warrant will be issued.

---

8. This section provides:

Depositions, warrants, or other papers or copies thereof offered in evidence upon the hearing of any extradition case shall be received and admitted as evidence on such hearing for all the purposes of such hearing if they shall be properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped, and the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof that the same, so offered, are authenticated in the manner required.