619 F.2d 167
 Michele SINDONA, Petitioner-Appellant,
v.
George V. GRANT, United States Marshal for the Southern
District of New York, Respondent-Appellee.
George V. GRANT, United States Marshal for the Southern
District of New York, Respondent-Appellant,
v.
Michele SINDONA, Petitioner-Appellee.
 Nos. 618, 764, Dockets 78-2155, 79-2175.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 8, 1980.
Decided March 21, 1980.
 
 John J. Kirby, Jr., New York City (Mudge, Rose, Guthrie & Alexander, New York City, Laurence V. Senn, Jr., Todd L. Klipp, Laurence A. Urgenson and Roberta R. Brackman, New York City, of counsel); Proskauer, Rose, Goetz & Mendelsohn, New York City (Marvin E. Frankel, and Steven J. Stein, New York City, of counsel); Robert Kasanof, New York City, Clark, Wulf, Levine & Peratis, New York City (Ramsey Clark and Melvin L. Wulf, New York City, of counsel); for petitioner-appellant-appellee, Michele Sindona.
 John J. Kenney, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., S. D. New York, Charles M. Carberry, David C. Patterson, Asst. U. S. Attys., New York City, of counsel); for respondent-appellant-appellee, United States of America.
 Before MOORE, FRIENDLY and MESKILL, Circuit Judges.
 FRIENDLY, Circuit Judge:
 
 
 1
 This extradition case has had a tangled history. On September 7, 1976, the United States, acting on behalf of the Republic of Italy, commenced an extradition proceeding in the District Court for the Southern District of New York against Michele Sindona, an Italian citizen, who was charged with the Italian crime of "fraudulent bankruptcy." Thomas P. Griesa, Judge, acting as committing judicial officer, held Sindona extraditable. Matter of Sindona, 450 F.Supp. 672 (S.D.N.Y.1978). Lacking a direct avenue of appeal, Sindona sought a writ of habeas corpus on grounds that will appear hereafter. See Shapiro v. Ferrandina, 478 F.2d 894, 901 (2 Cir.), cert. dismissed, 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973). His petition was denied by Judge Werker, Sindona v. Grant, 461 F.Supp. 199 (S.D.N.Y.1978) and Sindona appealed to this court. Before argument of the appeal, however, a federal grand jury indicted Sindona on charges mainly relating to the collapse of the former Franklin National Bank. The indictment prompted a second habeas corpus petition claiming that Sindona now fell within the ambit of Article VI(1) of the Treaty on Extradition between the United States of America and Italy, 26 U.S.T. 493, T.I.A.S. 8052, which bars extradition
 
 
 2
 (w)hen the person whose surrender is sought is being proceeded against or had been tried and discharged or punished in the territory of the requested party for the offense for which his extradition is requested.
 
 
 3
 Judge Werker granted this petition and ordered the termination of extradition proceedings on July 6, 1979. The United States appealed from that decision and moved to consolidate with Sindona's earlier appeal. We granted the motion, and both appeals are now before us. Meanwhile, Judge Werker's second order has been stayed.
 
 The Charges
 
 4
 Michele Sindona is an Italian businessman who is alleged to have controlled an international "financial group" of banks and other corporations during the early 1970's. In mid-1974, his fortunes soured abruptly with the simultaneous collapse of major banks on both sides of the Atlantic. In Milan, Italy, the Banca Privata Italiana (BPI) was ordered into forced liquidation by the Italian Ministry of the Treasury on September 27, 1974 and adjudged insolvent by a Milan court on October 15, 1974. Only two months before, on August 1, 1974, BPI had been formed from the merger of two Sindona-controlled banks, the Banca Unione (BU) and the Banca Privata Finanziaria (BPF). In the United States, the Franklin National Bank was declared insolvent on October 8, 1974, and its holding company, the Franklin National Corporation of New York (Franklin) filed a bankruptcy shortly thereafter. Sindona held 21.6% of Franklin's shares through Fasco International, a Luxembourg holding company.
 
 
 5
 The Italian charges underlying the request for Sindona's extradition stem from the collapse of BPI. This debacle and the attendant investigations prompted several warrants for Sindona's arrest; the third, filed on July 2, 1975, accompanied the extradition request and ordered the apprehension of Sindona and one Carlo Bordoni, the former Managing Director of BU, on four charges alleging violations of Articles 216, 217, 219 and 223 of the Italian Bankruptcy Law (Royal Decree of March 26, 1942, No. 267). Of these, one charge of "simple bankruptcy" under Article 217 was dropped during the proceedings below. The remaining charges and associated provisions of Italian law relate to the crime of "fraudulent bankruptcy."[1] The first asserts that Sindona, and Bordoni, in their official capacities as officers and directors of BU and BPF,
 
 
 6
 . . . did distract, hide and cover up, in the course of the years 1971, 1972, 1973 and 1974, an enormous mass of the financial assets of the aforesaid banks.
 
 
 7
 It further alleges that the principals routinely financed the business ventures of a group of foreign and Italian corporations by placing BU and BPF funds, totalling some 150 billion lira, on time deposits with foreign banks, while secretly instructing the depository banks to convey these funds through "fiduciary accounts" to various corporations in the Sindona "group", see discussion infra. The second charge accuses Sindona and Bordoni of falsifying BU and BPF accounting records with the intent of procuring an unjust profit; it further details ten methods of illegally altering corporate books which the principals are said to have employed with the effect of rendering BU and BPF official records meaningless. The third charge complains that by falsifying balance sheets and books, Sindona and Bordoni fraudulently misrepresented the true economic conditions of BU and BPF from 1970 through 1973.
 
 
 8
 Although the Italian warrant is notably lacking in specifics, it refers to three supporting documents for factual amplification: the bank examiners' report for BU prepared by investigators from the Bank of Italy (a similar report for BPF was withheld), the liquidator's report prepared by the appointee of the Ministry of the Treasury, and the declaration of insolvency issued by the Milan court. These submissions are also supplemented by corroborating materials including, inter alia, the depositions of three former BPF employees who possessed personal knowledge of that bank's foreign transactions.
 
 
 9
 The Italian liquidator's and bank examiners' reports describe in detail for the period beginning in mid-1973 the so-called "fiduciary transactions" complained of in the warrant. Their findings have been summarized by Judge Griesa:
 
 
 10
 Funds of BU and BPF would be deposited with certain foreign banks, principally Amincor Bank of Zurich. These banks would be instructed to credit the funds to beneficiaries which were foreign companies controlled by Sindona. Although in theory these transactions might have been considered as loans by BU and BPF to the Sindona companies, the reports state that there was no valid documentation in the books and records of BU and BPF, and that all trace of the true beneficiaries of the deposits was removed from the banks' documentation . . . . (T)he import of both the examiners' and the liquidator's report is that Sindona never intended to repay the funds transferred by fiduciary deposits, or at least soon decided that there would be no repayment.
 
 
 11
 450 F.Supp. at 681. Beginning in early 1974, the reports allege, Sindona and Bordoni substituted assetless "bridge corporations" as the beneficiaries of the fiduciary deposits on the records of the depository banks, purportedly in order to frustrate any recoupment of the disbursed funds in the event of a BU-BPF bankruptcy.[2] The reports also charge numerous improper foreign exchange transactions resulting in large losses to BU, BPF, and the merged entity, BPI losses that in some instances allegedly served as covert transfers of funds from the Italian banks to other Sindona interests. In addition, both the reports and the depositions describe elaborate accounting fictions and other techniques employed to conceal the massive drain on BU-BPF assets. The bank examiners' report concludes that the losses suffered by BU alone from unauthorized foreign exchange transactions and fiduciary deposits totals about 118 billion lira; the Italian warrant charges Sindona with improperly diverting 166 billion lira from a total BPI deficit of 180 billion lira. Using the 650-lira-to-the-dollar foreign exchange rate adopted by Judge Griesa, the equivalent dollar values are roughly, $182,000,000, $255,000,000 and $277,000,000 respectively.[3]
 
 
 12
 The American indictment alleges many of the same generic forms of fraudulent conduct described in the Italian reports, albeit in connection with the Franklin National Bank and Talcott National Corporation. Unlike the Italian warrant, however, the federal indictment is richly detailed. It charges a number of underlying criminal acts, most of which are pleaded on three levels: as the objects or overt acts of a single overall conspiracy between Sindona and Bordoni to defraud American investors and various United States governmental agencies, as individual substantive offenses or the basis for such offenses, and as the elements of securities fraud, i. e., as deceptive devices used in connection with the purchase of Franklin stock from individual investors.
 
 
 13
 In rough chronological order, the criminal conduct underlying the American indictment is alleged to have begun with the failure of Sindona and Bordoni to disclose to American authorities and investors that the funds used to acquire interests in Franklin during July of 1972, and in a second American company, the Talcott National Corporation (Talcott) in early spring of 1973, were fraudulently abstracted from BU and BPF through the fiduciary account device.[4] The indictment alleges that after Sindona and Bordoni secured control of Franklin they reversed the flow of funds through the fiduciary account conduit during October, 1972, by fraudulently transferring $15,000,000 from Franklin back to BU. In this regard they are also said to have bribed the general manager of Interbanca, a Milan bank, to perform an intermediary role in the transaction.[5] Next, Sindona and Bordoni are accused of causing the Franklin Bank to enter numerous fictitious foreign exchange transactions during 1973 and early 1974, including wash transactions designed to inflate Franklin's profits prior to the preparation of financial statements, and, in one instance, a paper deal intended solely to disguise the transfer of $2,001,000 from BU to Franklin via the fiduciary deposit device.[6] Sindona is also charged with one count of perjury for denying knowledge of these transactions during a later Security and Exchange Commission investigation (Count 84). Finally, Sindona and Bordoni are charged with engaging Franklin in actual but unauthorized foreign exchange trading at a total cost to the bank of $30,000,000. This loss they allegedly concealed by falsifying Franklin's books and records and by procuring the complicity of a senior Franklin officer through bribery.[7]
 
 Issues on Appeal
 
 14
 Well before the filing of the American indictment on March 19, 1979, Judge Griesa, sitting as a committing judicial officer, rendered a decision granting extradition, 450 F.Supp. 672 (1978). He held that the Italian evidence of unlawful fiduciary deposits, improper foreign exchange trading, and the "transfer" of debts sufficed to establish probable cause of separate violations of Article 216(1) of the Italian Bankruptcy Code, see note 1 supra ; that the proofs of accounting falsification constituted probable cause of violations of Article 216(2); and that the evidence gave probable cause to believe that Sindona's multiple delicts had "caused" the bankruptcy of BPI within the meaning of Article 223. See 450 F.Supp. at 688. After rejecting Sindona's plea for a hearing on certain evidentiary matters and determining that neither the Treaty nor federal law otherwise barred extradition, the court issued a warrant of commitment.[8] Sindona's first petition for habeas corpus attacked this order on numerous grounds, all of which were rejected by Judge Werker.
 
 
 15
 Following the denial of his first petition for habeas corpus and the intervention of the American indictment, Sindona filed a second habeas petition, urging that the Treaty precludes dual prosecution of the Italian and American charges. Believing that the situation had been fundamentally changed, Judge Werker found in Sindona's favor and directed that the writ should issue and the extradition proceedings should be terminated. The United States appeals on two grounds: first that the district court erroneously failed to apply the federal double jeopardy test, alleged to be found in Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932), and second, that even if the treaty mandates a standard broader than the Blockburger rule in construing the "double jeopardy" provision, Sindona remains extraditable in light of the disparate conduct underlying the American and Italian charges as well as assurances by Italian officials that Sindona will not be prosecuted in Italy for his American transactions.[9]
 
 
 16
 We affirm the district court's denial of the first petition and reverse the grant of the second.
 
 The First Petition
 
 17
 In light of the thoughtful opinions of Judges Griesa and Werker, 450 F.Supp. 672, 461 F.Supp. 199, we have little difficulty in affirming the denial of Sindona's first habeas petition.
 
 
 18
 This begins with a series of claims stemming from the core allegation that he is the victim of political persecution in Italy. The first of these invokes Article VI of the Treaty, which provides in relevant part:
 
 
 19
 Extradition shall not be granted in any of the following circumstances:
 
 
 20
 5. When the offense for which extradition is requested is of a political character, or if the person whose surrender is sought proves that the requisition for his surrender has, in fact, been made with a view to try or punish him for an offense of a political character.
 
 
 21
 Recognizing that the change of fraudulent bankruptcy is not political on its face, Sindona nonetheless urges that it has a "political character" for purposes of Article VI(5) as a whole because it resulted from political maneuverings and is pursued for political reasons. We disagree. The controlling language in both clauses of Article VI(5) is "offense of a political character." Following the principle announced in In re Castioni, (1891) 1 Q.B. 149, American courts have uniformly construed "political offense" to mean those that are incidental to severe political disturbances such as war, revolution and rebellion. See, e. g., Garcia-Guillern v. United States, 450 F.2d 1189, 1192 (5 Cir. 1971), cert. denied, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972); Jimenez v. Aristequieta, 311 F.2d 547, 560 (5 Cir. 1962), cert. denied, 373 U.S. 914, 83 S.Ct. 1302, 10 L.Ed.2d 415 (1963); In re Ezeta, 62 F. 972, 977-1002 (N.D.Cal.1894). See generally Garcia-Mora, The Nature of Political Offenses: A Knotty Problem of Extradition Law, 48 Va.L.Rev. 1226, 1244-49 (1962) (discussing American construction of political offense). The offense charged against Sindona is clearly non-political in this sense, and it would remain so even if the recognized definition were to be broadened to include offenses accompanying political disturbances of a less violent character than those named above. It likewise cannot reasonably be said that the extradition request was made with a view to trying Sindona covertly for a political offense within the meaning of the second clause of Article VI(5). Sindona does not argue that Italy threatens punishment for a second "political offense" in addition to fraudulent bankruptcy, but merely that any prosecution for that offense would be politically motivated. In Jhirad v. Ferrandina, 536 F.2d 478 (2 Cir.), cert. denied, 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976), we rejected a similar claim brought under similar treaty language where, as here, the record provided a "substantial basis" for prosecution of the offense alleged by the extradition request. Id. at 485. Judge Griesa was not obligated to do more in divining the motives of the Italian prosecution. See Garcia-Guillern v. United States, supra, 450 F.2d at 1192; In re Lincoln, 228 F. 70, 73-74 (E.D.N.Y.1915), aff'd per curiam,. 241 U.S. 651, 36 S.Ct. 721, 60 L.Ed. 1222 (1916). As it was, however, he examined the affidavits supporting Sindona's political offense claim and found them to be "totally unpersuasive", 450 F.Supp. at 639. On the record before us, we cannot disagree.
 
 
 22
 Sindona next urges that he is exempt from extradition under Article 33 of the United Nations Convention and Protocol Relating to the Status of Refugees, 19 U.S.T. 6223, T.I.A.S. 6577 (the U.N. Convention), to which the United States is a party. Paragraph 1 of that Article precludes the expulsion or return of a refugee whose life or freedom would be threatened inter alia "on account of his . . . political opinion." However, as both district judges observed, Article 1F of the U.N. Convention excludes from that document's protection
 
 
 23
 any person with respect to whom there are serious reasons for considering that:
 
 
 24
 (b) he has committed a serious non-political crime outside the country of refuge prior to his admission to that country as a refugee . . . .
 
 
 25
 Judge Griesa found "serious reason" for believing that Sindona had committed a "serious non-political crime;" his determination of probable cause and rejection of the political offense claim brought under the Treaty led inexorably to that conclusion. See 450 F.Supp. at 694. Neither the record before us nor the plain language of Article 1F indicates that the U.N. Convention claim merited any additional determination, much less an evidentiary hearing. Sindona's reliance on Nicosia v. Wall, 442 F.2d 1005 (5 Cir. 1971), to the contrary is misplaced. That decision merely instructed the extraditing magistrate to determine whether evidence of "distinct political overtones" would support a refugee defense under the U.N. Convention when the magistrate had pointedly refused to consider this issue at all. Id. at 1006-07. Here the claim was considered and rejected.
 
 
 26
 Appellant also argues that apart from the protections of the Treaty and the U.N. Convention, his extradition should be denied because return to Italy would subject him to risk of murder or injury at the hands of political enemies on the left. The undated photographs incorporated in the Sindona main brief indicate that the slogan "a morte Sindona" may have commanded a considerable following among Italian demonstrators. However, the degree of risk to Sindona's life from extradition is an issue that properly falls within the exclusive purview of the executive branch.[10] See Peroff v. Hylton, 542 F.2d 1247, 1249 (4 Cir. 1976), cert. denied, 429 U.S. 1062, 97 S.Ct. 787, 50 L.Ed.2d 778 (1977) (executive may deny extradition request but requesting country has primary responsibility for protecting against assassination). As Judge Wisdom has observed:
 
 
 27
 Review by habeas corpus . . . tests only the legality of the extradition proceedings; the question of the wisdom of extradition remains for the executive branch to decide.
 
 
 28
 Wacker v. Bisson, 348 F.2d 602, 606 (5 Cir. 1965). Sindona counters that our decision in Gallina v. Fraser, 278 F.2d 77 (2 Cir.), cert. denied, 364 U.S. 851, 81 S.Ct. 97, 5 L.Ed.2d 74 (1960), requires the extraditing magistrate to consider whether the circumstances awaiting a fugitive upon extradition would be so egregious as to offend the court's "sense of decency." We find no such rule in Gallina. That decision denied habeas corpus on the strength of established authority holding that the federal courts may not "inquire into the procedures which await the relator upon extradition," 278 F.2d at 78. The fact that Gallina also added the caveat that some situations were imaginable in which a federal court might wish to reexamine the principle of exclusive executive discretion, id. at 79, falls well short of a command to do so here. In any event, it is apparent that Judge Griesa thoroughly examined the affidavits and exhibits relevant to Sindona's claim. If Gallina alone may not have required this much, it follows a fortiori that there was no obligation to hold an evidentiary hearing.
 
 
 29
 Moving beyond his interrelated political claims, Sindona next urges two Treaty-based arguments of a more technical nature. The first derives from Article V of the Treaty, which provides in relevant part:
 
 
 30
 Extradition shall be granted only if the evidence be found sufficient, according to the laws of the requested Party, . . . to justify (the requested person's) committal for trial if the offense of which he is accused had been committed in its territory. . . .
 
 
 31
 Sindona contends that the test under the Treaty is United States national procedural law and not the procedural law of New York, a proposition with which we agree, Greci v. Birknes, 527 F.2d 956 (1 Cir. 1976); that by virtue of the Fifth Amendment committal of Sindona for a federal trial on charges as grave as those made in Italy, would have had to be by indictment; and that an indictment requires a prima facie case and not merely probable cause.
 
 
 32
 We are not at all sure of the validity of this last link, see United States v. Mackey, 474 F.2d 55, 56-57 (4 Cir.), cert. denied, 412 U.S. 941, 93 S.Ct. 2782, 37 L.Ed.2d 401 (1973); 8 Moore, Federal Practice P 6.83(2) (1972). Although federal prosecutors generally go considerably beyond proving probable cause before a grand jury, this is doubtless due to the desire to obtain an indictment rather than because of any legal requirement. Costello v. United States, 350 U.S. 359, 363, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1953), and United States v. Calandra, 414 U.S. 338, 344-, 94 S.Ct. 613, 618-19, 38 L.Ed.2d 561 (1974), indicate that indictments will not be examined for adequacy of the evidence. However, we need not decide the question since the whole line of argument runs afoul, among other cases, of Benson v. McMahon, 127 U.S. 457, 8 S.Ct. 1240, 32 L.Ed. 234 (1888). There under a treaty with Mexico which also referred to national law, id. at 463, 8 S.Ct. at 1243, the Court held the proper standard of sufficiency to be similar to those applicable in
 
 
 33
 those preliminary examinations which take place every day in this country before an examining or committing magistrate for the purpose of determining whether a case is made out which will justify the holding of the accused, either by imprisonment or under bail, to ultimately answer to an indictment, or other proceeding, in which he shall be finally tried upon the charge made against him.
 
 
 34
 id. See F.R.Cr.P. 5.1(b). This was the clear holding in Greci, supra, 527 F.2d at 959. While that opinion did not discuss the possibility that a federal standard higher than probable cause might have been intended, it would have been remarkable indeed that when, as appears from the Greci opinion, the Treaty drafters opted for federal law rather than the law of the state of the crime, they meant anything other than the probable cause standard that had been regularly employed in extradition cases in the past. See, e. g., Benson v. McMahon, supra, 127 U.S. 457, 8 S.Ct. 1240; Ornelas v. Ruiz, 161 U.S. 502, 512, 16 S.Ct. 689, 692, 40 L.Ed. 787 (1896); Collins v. Loisel, 259 U.S. 309, 315-, 42 S.Ct. 469, 471-72, 66 L.Ed. 956 (1922) (Brandeis, J.); Shapiro v. Ferrandina, supra, 478 F.2d at 901 (2 Cir.); Peroff v. Hylton, supra, 542 F.2d at 1249; Jhirad v. Ferrandina, supra, 536 F.2d at 485; Garcia-Guillern v. United States, supra, 450 F.2d at 1191-92.
 
 
 35
 Sindona also argues that Judge Griesa failed to specify the elements of the extradition offense and attendant proof with sufficient particularity to satisfy the specialty clause of the Treaty, which provides in part that a person extradited
 
 
 36
 . . . shall not be detained, tried or punished in the territory of the requesting Party for an offense other than that for which extradition was granted . . . (Article XV).
 
 
 37
 We disagree in light of Judge Griesa's careful review of the Italian submissions, 450 F.Supp. at 680-84, exegesis of the relevant provisions of the Italian Bankruptcy Law, id. at 676-78, and specification of the categories of alleged acts which, if proven, would violate these provisions, id. at 688-89. Unlike the situation in Shapiro v. Ferrandina, supra, where we discussed the international principle of specialty at length, there is no danger here that Sindona will be subject to multiple Italian charges stemming from different legal characterizations of the same acts. Indeed, Sindona's predicament is quite the opposite; several Italian charges clearly extraditable and with a fixed range of penalties, are charged on the basis of alleged acts so varied and numerous that it was unnecessary to inventory more than a fraction of them in order to establish probable cause.
 
 
 38
 Appellant's final claim is that even if extradition were otherwise proper, due process requires its delay until such time as the numerous American proceedings to which he is a party are concluded or as his effective representation no longer requires consultation with counsel. Sindona does not assert the right to be present in person during the American civil litigation; rather his argument is that if extradited he will be jailed, and once incarcerated, a hostile Italian judge may deny him access to American counsel. It is this last link of the chain, the denial of access to counsel representing him in the American courts, that is said to constitute the deprivation.
 
 
 39
 We find no merit in the argument. Sindona is involved in at least six different civil actions, three of which have been in progress for more than four years, and in the American criminal proceeding that has recently gone to trial.[11] Sindona is seeking a lengthy delay in the fulfillment of treaty obligations because of what amounts to the risk that the complexities of the American litigation after an acquittal in his criminal trial may render inadequate indirect forms of consultation, e. g., written or through Italian counsel, and that an Italian judge may deny face-to-face consultation with American counsel.
 
 
 40
 Such arguments are properly addressed to the executive branch, which is empowered to make the final decision on extradition and has assumed the discretion to deny or delay extradition on humanitarian grounds. See, e. g., Peroff v. Hylton, supra, 542 F.2d at 1249; Wacker v. Bisson, supra, 348 F.2d at 606. See also 6 Whiteman, supra, § 38 at 1046. In addition, the Secretary of State may, at his discretion, "narrow the terms of extradition approved by the magistrate," Shapiro v. Ferrandina, supra, 478 F.2d at 906. The Secretary would thus be empowered if so advised, to condition surrender on Sindona's continuing access to American counsel. See 6 Whiteman, supra, § 39 at 1051-53.
 
 The Second Petition
 
 41
 We come now to Judge Werker's ruling on the second petition for habeas corpus, filed after the return of the federal indictment, that extradition was barred by Article VI(1) of the Treaty. As stated above this provides that extradition shall not be granted:
 
 
 42
 (w)hen the person whose surrender is sought is being proceeded against or has been tried and discharged or punished in the territory of the requested Party for the offense for which his extradition is requested.
 
 
 43
 Such provisions, commonly termed "double jeopardy" clauses, have become "common to most extradition treaties", 6 Whiteman, supra, § 40 at 1054. See Galanis v. Pallanck, 568 F.2d 234, 238 (2 Cir. 1977). In most recent United States treaties, the formulation of these provisions is the same as in the treaty with Italy, namely, extradition is precluded when the person sought is being or has been prosecuted "for the offense for which his extradition is requested" (emphasis added). Convention on Extradition Between the United States and Sweden, 14 U.S.T. 1845, T.I.A.S. 5496 (1963) (Article V(1); Convention Relating to Extradition Between the United States and Israel, 14 U.S.T. 1707, T.I.A.S. 5476 (1963) (Article VI(1)); Treaty on Extradition Between the United States and New Zealand, 22 U.S.T. 1, T.I.A.S. 7035 (1970) (Article VI(1)); Treaty on Extradition Between the United States and Spain, 22 U.S.T. 737, T.I.A.S. 7136 (1971) (Article V(1)); Treaty on Extradition Between the United States and Argentina, 23 U.S.T. 3501, T.I.A.S. 7510 (1972) (Article 7(a)); Treaty on Extradition Between the United States and Paraguay, 25 U.S.T. 967, T.I.A.S. 7838 (1974) (Article 5(1)); Treaty on Extradition Between the United States and Denmark, 25 U.S.T. 1293, T.I.A.S. 7864 (1974) (Article 7(1)); Treaty on Extradition Between the United States and Australia, 27 U.S.T. 957, T.I.A.S. 8234 (1976) (Article VII(1)). However, a recent treaty with France provides a notable exception by substituting "acts" for "offenses" in the critical phrase. See Supplementary Extradition Convention to the Convention of 1909 Between the United States and France, 22 U.S.T. 407, T.I.A.S. 7075 (1971) (Article VI(1)). See also Harvard Draft Convention on Extradition, 29 Amer.J.Int'l Law 148 (Supp.1935) (using phrase "act or acts for which extradition is sought"). The Government argues that these formulations and similar ones in state extradition acts confer a broader protection than "offense" and that choice of the latter term in the Italian treaty is therefore significant.
 
 
 44
 The widespread use of such clauses has produced relatively little in the way of reported decisions or helpful commentary with respect to their application. Neither of the American decisions cited to us, Stowe v. Devoy, 588 F.2d 336 (2 Cir. 1978) and In re Ryan, 360 F.Supp. 270 (E.D.N.Y.), aff'd mem. 428 F.2d 1397 (2 Cir. 1973), sheds any light on the problem before us. Perhaps the only firm conclusion to be drawn from the sparse commentary is that such treaty restrictions derive from the fundamental norm of non bis in idem (from the Latin maxim "Nemo debet bis vexari pro eadem causa") which goes back to ancient times and is found throughout the civil as well as the common law. See Bartkus v. Illinois, 359 U.S. 121, 151-55, 79 S.Ct. 676, 695-697, 3 L.Ed.2d 684 (1959) (Black, J., dissenting). See also Bassiouni, International Extradition and World Public Order 452-59 (1974). Indeed, the earliest such treaty restriction was incorporated in a 1844 Treaty between two civil law countries, France and Holland. See Harvard Draft Convention, supra, 29 Amer.J.Int'l Law at 148-49. Perhaps because of the diverse origins of the rule, however, no established solution exists for the "famous problem of identity of offenses for application of non bis in idem," W. Duk, "Principles Underlying the European Convention on Extradition" 48 n.14, in European Committee on Crime Problems, Legal Aspects of Jurisdiction Among European States (1970). In what may be the most extended analysis by a commentator, Bassiouni, supra, noted that non bis in idem is applied "more frequently" when the requested state has already commenced prosecution for "the same, meaning identical, conduct," id. at 455. But he adds that the terms "same offense" and "same conduct" are subject to broad interpretative leeway, id. 455-56. "Same conduct" may range from "identical acts" to "multiple acts committed in more than one place and at different times but related by the actor's initial design"; "same offenses" may range from "identical charges" to "related . . . but not included (offenses)." Id. Thus, he observes, the scope of any given double jeopardy provision will hinge in large part on interpretations given these terms that are borrowed from the domestic law and policies of the contracting parties. See id. at 459. See also Bassiouni & Nanda, 2 Treatise on International Criminal Law § 7.9, at 273 (1973) (noting absence of accepted definition of "identity of the offense" for rule of non bis in idem ); M. Friedland, Double Jeopardy 391 (1969) (predicting that an English judge would apply English double jeopardy rules to treaty provision if asked to extradite accused who has been tried in England and is requested by foreign state for second offense based on the same transaction).
 
 
 45
 Relying on Article X of the Treaty which specifies that "(t)he determination that extradition should or should not be granted shall be made in accordance with the law of the requested Party", the Government urges that the proper test is that applicable to the double jeopardy clause of the Fifth Amendment, and asserts this to be the statement in Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932):
 
 
 46
 the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not.[12]
 
 
 47
 On this basis Article VI(1) of the Treaty would clearly be inapplicable; the offense charged in Italy requires proof of many facts not charged in the United States and vice versa. But this would almost inevitably be the case with crimes listed in extradition treaties which are not limited to acts that are criminal under the laws of both countries, see 6 Whiteman, supra, § 13; Factor v. Laubenheimer, 290 U.S. 276, 291-94, 54 S.Ct. 191, 194-196, 78 L.Ed. 315 (1933). Adoption of the Blockburger test, which does not even mark the outmost bounds of protection of the double jeopardy clause of the Fifth Amendment, see note 12 supra, would, as Judge Werker held, be a crabbed and wholly inappropriate reading of Article VI(1). Foreign countries could hardly be expected to be aware of Blockburger ; moreover, as the previous discussion has shown, in construing a double jeopardy clause in a treaty, embodying an ancient and widely recognized principle of civilized conduct, a court should not deem itself bound by a quiddity of the law of the requested party.
 
 
 48
 The district court was thus correct in adopting what it termed "a modified and more flexible test of whether the same conduct or transaction underlies the criminal charges in both transactions." This seems somewhat analogous to Mr. Justice Brennan's view, Ashe v. Swenson, 397 U.S. 436, 453-54, 90 S.Ct. 1189, 1199, 25 L.Ed.2d 469 (1970) (concurring opinion), repeated in many other cases, that "the Double Jeopardy Clause requires the prosecution, except in most limited circumstances, 7 to join at one time all the charges against a defendant which grow out of a single criminal act, occurrence, episode or transaction."[13] Perhaps an even more appropriate standard is that of the Department of Justice's Petite policy, Petite v. United States, 361 U.S. 529, 530-31, 80 S.Ct. 450, 451, 4 L.Ed.2d 490, which provides:
 
 
 49
 No federal case should be tried when there has been a state prosecution for substantially the same act or acts without a recommendation having been made to the Assistant Attorney General demonstrating compelling Federal interests for such prosecution. (Emphasis supplied).
 
 
 50
 United States Attorneys' Manual § 9-2.142. See Rinaldi v. United States, 434 U.S. 22, 27-28, 98 S.Ct. 81, 84-85, 54 L.Ed.2d 207 (1977).[14]
 
 
 51
 Since application of the Petite policy rests largely in the discretion of the Department of Justice and applies only to the United States and not to the states, case law guidance on its scope is limited. Nonetheless, several examples are instructive. In Rinaldi, supra, the policy was applied when a single robbery yielded a state conviction on multiple charges (carrying a concealed weapon, conspiracy to commit robbery, and conspiracy to commit grand larceny) and a federal conviction for "conspiracy to affect interstate commerce by robbery," 434 U.S. at 23, 98 S.Ct. at 82. In United States v. Thompson, 579 F.2d 1184 (5 Cir.) (en banc), cert. denied, 439 U.S. 896, 99 S.Ct. 257, 58 L.Ed.2d 243 (1978), it was agreed that state and federal charges involved the "same factual transaction" for purposes of the Petite policy where the act of receiving a large marijuana shipment resulted in federal charges of conspiracy to distribute and state charges of possession with intent to deliver, id. at 1185. By contrast, it is doubtful that the policy holds when a prisoner faces federal charges for kidnapping as part of a prison break, and state charges for escape, burglary, robbery and theft in the course of the same break. See United States v. Fritz, 580 F.2d 370, 375 n.1 (10 Cir.), cert. denied, 439 U.S. 947, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978). Indeed, United States v. Mikka, 586 F.2d 152 (9 Cir. 1978), cert. denied, 440 U.S. 921, 99 S.Ct. 1247, 59 L.Ed.2d 1247 (1979), held that a single robbery yielding both state armed robbery charges and a federal charge of possession of a firearm by a felon fell outside the ambit of the Petite policy, id. at 154.
 
 
 52
 While believing that the standard to be applied in construing Art. VI(1) of the Treaty should be at least as broad as that expressed in Mr. Justice Brennan's concurring opinion in Ashe v. Swenson, supra, or in the Petite policy, we do not accept the conclusion Sindona would have us draw from it. Broadly speaking, the Italian prosecutor charged a gigantic fraud perpetrated on the Italian banks which generated funds that permitted Sindona to engage in allegedly criminal activities in Italy and other countries including the United States. The concern of the Republic of Italy is the harm done to depositors in the Italian banks; that of the United States is the damage to American depositors and investors. The crimes charged in the American indictment, while serious, are on the periphery of the circle of crime charged by the Italian prosecutors. Although the alleged Italian crime may have been the "but-for" cause of the alleged American offenses in providing Sindona with the wherewithal, it is not the crime for which the United States is proceeding against him. Indeed, principles of territorial jurisdiction make it extremely doubtful that this country could proceed against Sindona for the overwhelming bulk of the matters being charged in Italy or that Italy could prosecute him for most of the charges in the American indictment. Article VI(1) of the Treaty could not have been intended to have the consequence that substantial elements of crime should be left unpunishable. We thus reject Sindona's argument that Article VI(1) confers immunity from extradition.
 
 
 53
 There remains the question of what, if anything, should be done about certain areas of overlap. Those on which Sindona particularly relies are:
 
 
 54
 (1) Potential Italian exploitation of the Franklin and Talcott fiduciary deposit transactions in the prosecution for fraudulent bankruptcy and the inclusion of Sindona's alleged failure to disclose the fraudulent character of these same transactions in the American conspiracy and stock fraud counts;
 
 
 55
 (2) Potential Italian prosecution for the alleged transfer of $2,001,000 from BU to Franklin, and the inclusion of this transfer in the American conspiracy, wire fraud and mail fraud counts; and
 
 
 56
 (3) Potential Italian prosecution for falsifying the books and records of the Italian banks, and the American wire and mail fraud counts relating to fictitious foreign transactions.
 
 
 57
 Happily it is not necessary for us to consider whether Sindona is entitled to relief with respect to these three items. The Italian prosecutor submitted to the district court a statement that he would not include any crimes connected with the Franklin and Talcott operations, and the Government, in its reply brief, states (p. 15) that it
 
 
 58
 will submit to Judge Griesa a certification which states that extradition is granted for the violation of the Italian Bankruptcy Law as set out in the warrant and supporting investigative reports, specifically excluding any offense of "distracting" either the $67 million or the $2,001,000 mentioned in the American indictment, and also excluding any offense of falsifying the books and records of the Italian banks with respect to the fictitious exchange transactions described in the American indictment.
 
 
 59
 There is ample authority for the affixing of such conditions to a warrant of surrender. See 6 Whiteman, supra, § 39.
 
 
 60
 We therefore reverse the order granting the writ of habeas corpus unless Judge Griesa or some other magistrate designated under 18 U.S.C. § 3184 fails to certify within 30 days Sindona's extraditability in accordance with this opinion.[15]
 
 
 
 [1]
 Article 216 of the Italian Bankruptcy Law provides in relevant part:
 (Fraudulent bankruptcy). A businessman is punished with imprisonment of from three to ten years, if declared to be bankrupt, when he:
 1) has distracted, hidden, dissimulated, destroyed or dissipated all or part of his assets or, with the intent of damaging his creditors, has alleged or acknowledged the existence of nonexisting debts;
 2) has subtracted, destroyed or falsified, wholly or partly, with the intent of procuring for himself or others an unjust profit or of damaging his creditors, the books and other accounting records or has so kept them as to make it impossible to reconstruct the assets of the transactions of the business.
 Article 219 details aggravating and extenuating circumstances of violations of Article 216, together with attendant adjustments in penalties. Lastly, Article 223 directs that Article 216 penalties are applicable to directors, general managers, auditors, and liquidators of bankrupt corporations when:
 1) they have committed any of the acts contemplated in . . . (certain Articles of the Italian Civil Code);
 2) they have caused by fraud or by the effects of fraudulent transactions the bankruptcy of the company.
 In addition, the provisions of the last subsection (subsection (2)) of Article 216 is applicable in all cases.
 Judge Griesa held that subsections (1) and (2) of Article 223 were disjunctive, 450 F.Supp. at 678, thus permitting Sindona to be charged under Article 216(1) and Article 223(2) although he is not alleged to have violated the provisions of the Civil Code listed in Article 223(1). That construction is not challenged here.
 
 
 [2]
 Pursuant to "fiduciary contracts" that were apparently kept secret, at least in Milan, the foreign depository banks had no liability for fiduciary funds received from BPF and BU and transferred to Sindona corporations. However, the foreign banks, chiefly Amincor, collected commissions on these transactions and were obligated to advise BU and BPF whether the beneficiaries repaid the funds so advanced. According to the liquidator's report, in most cases there was no repayment
 
 
 [3]
 The Government's brief states that Sindona is charged with "distractions" totalling $225,000,000. This figure apparently results from applying an 800 lira-to-the-dollar exchange rate to the entire 180 billion deficit alleged in the Italian warrant. See 450 F.Supp. at 682 n.5
 
 
 [4]
 Count 1 alleges active concealment and failure to disclose the fraudulent source of funds for these acquisitions as one of the objects of the broader Sindona-Bordoni conspiracy (P 35). It also alleges as overt acts of the conspiracy the individual transactions comprising the trail of funds from BU and BPF through two Swiss banks, to Fasco International and thence to sellers of shares in the United States. (P 55(a)-(e), (r)-(s)). Counts 85-99 incorporate this concealment in the stock fraud charges. Counts 2-13 recite associated substantive offenses of wire fraud in connection with the Franklin and Talcott acquisitions, and also describe the fiduciary account device
 The latter counts, i. e., 2-13, were dismissed on the Government's motion in the district court. An express motivation for the motion to dismiss was concern that these counts might be seen to overlap with the Italian charges and thus interfere with the extradition proceedings.
 
 
 [5]
 Count 1 alleges that defrauding Franklin through the fiduciary deposit device was an object of the general conspiracy (P 36), recites as overt acts the alleged $15,000,000 disbursal from Franklin (P 50) and instance of bribery (P 49), as well as the ancillary transactions and agreements (P 50(i)-(n)). Counts 14-20 charge associated substantive offenses of wire fraud and bank embezzlement
 
 
 [6]
 Count 1 details these fictitious transactions as aspects of the conspiracy inter alia in P 55(v)-(x). They also form the basis of 37 wire and mail fraud counts (Counts 24-60), 20 counts of making false entries in the books and records of a bank (Counts 61-80), and two counts of making false statements in support of an application for a loan extension from another bank (Counts 81-82)
 
 
 [7]
 These charges are reflected inter alia in the conspiracy count (PP 51-55, 55y), and embezzlement count (Count 83), and three wire fraud counts arising from the alleged bribe (Counts 21-23)
 
 
 [8]
 Apparently no certification of Judge Griesa's order has yet been forwarded to the Secretary of State so that an extradition warrant might issue upon requisition by the Italian authorities. Certification awaits the disposition of this appeal
 
 
 [9]
 In support of its contention that the Italian and American charges arose from different underlying transactions, the Government submitted to the district court affidavits of the Milan Deputy Public Prosecutor, the chief bank examiner, and the liquidator. The statements of the examiner and the liquidator are to the effect that the fiduciary deposits used to fund the Franklin and Talcott acquisitions were not included in the reports submitted to Judge Griesa. However, these transactions were investigated after the preparation of submissions accompanying the extradition request. The final liquidator's report discusses the Talcott transaction but not the Franklin acquisition, apparently because the Italian banks were never fully compensated for the former while funds to cover the latter were obtained from an unrelated fiduciary deposit transaction. In addition, the $2,001,000 transfer from BU to Franklin, see discussion supra, falls within the time frame of the "distractions" charged by the Italian warrant
 The Italian prosecutor's affidavits, the most recent dated June 20, 1979, confirms that the Italian authorities have investigated the Franklin and Talcott acquisitions as well as the $2,001,000 transfer, but give assurances that these transactions are not included in the Italian charges, see infra.
 
 
 [10]
 A State Department attorney submitted a letter, dated March 6, 1978, reporting on Italian criminal procedure, the treatment of U.S. Military personnel tried by Italian courts, and State Department procedures for considering fugitive claims of political persecution by the requesting state. The letter recites that claims of political persecution are regularly investigated, and, if it is determined that a fugitive might be endangered by his surrender, the Department's practice is:
 (1) to bring to the attention of the requesting state the alleged danger; (2) to request appropriate assurances from that state, and (3) to instruct our Embassy in the requesting state, in the event that the fugitive is surrendered, to follow the case and report to the Department of State.
 
 
 [11]
 The Treaty itself defers extradition when the person sought is "being proceeded against or is serving a sentence in the territory of the requested Party for an offense other than that for which extradition has been requested." Article IX
 
 
 [12]
 As has been repeatedly pointed out, see, e. g., United States v. Sabella, 272 F.2d 206, 211 (2 Cir. 1959), "Blockburger was a case, not of repeated indictments, but of a single multiple count indictment", where quite different considerations are applicable, see Gore v. United States, 357 U.S 386, 392-93, 78 S.Ct. 1280, 1284-1285, 2 L.Ed.2d 1405 (1958). While "(i)f two offenses are the same under the test for purposes of barring consecutive sentences at a single trial, they necessarily will be for purposes of barring successive prosecutions," Brown v. Ohio, 432 U.S. 161, 166, 97 S.Ct. 2221, 2226, 53 L.Ed.2d 187 (1977), the converse is not true, see id. at 166-67 n.6, 97 S.Ct. at 2225-2226
 
 
 [13]
 One of the exceptions noted in footnote 7 is where "no single court had jurisdiction of all the alleged crimes."
 
 
 [14]
 We noted in Galanis v. Pallanck, supra, 568 F.2d at 238-239, that
 "(t)he position . . . adopted by the Department of State" in including double jeopardy clauses in extradition treaties "accords with the policy adopted by the Department of Justice in response to concerns expressed by the Supreme Court in the federal-state context."
 
 
 [15]
 For the reasons requiring this cumbersome method of disposition, see Shapiro v. Ferandina, supra, 478 F.2d at 914